[No. 37532.    En Banc.    March 19, 1964.]

*In the Matter of the Application for a Writ of Habeas Corpus of* DON ANTHONY WHITE, *Petitioner,* v. B. J. RHAY, *as Superintendent of the State Penitentiary, Respondent.\**

*Reported in 390 P. (2d) 535.

*David A. Weyer* and *James C. Young,* for petitioner.

*The Attorney General* and *Stephen C. Way, Assistant,* for respondent.

*Charles O. Carroll, James S. Munn, Philip L. Burton,* and *Landon Estep,* amici curiae.

HALE, J.—Comes now before us this original application for a writ of habeas corpus.

Petitioner Don Anthony White, presently confined in the Washington State Penitentiary awaiting execution, petitions the court to declare void that part of the judgment and sentence of the Superior Court for King County which imposes upon him the death penalty, and to remand the cause to the superior court for further proceedings.

The information filed in the Superior Court for King County, upon which petitioner was convicted, charged him in count 1 with murder in the first degree of Alice Jumper, committed December 24, 1959, while in the perpetration of, or in withdrawing from, the scene of a rape and robbery; and in count 2 with murder in the second degree charged to have been committed on the same day, but in a separate and different transaction from that set forth in count 1, for the killing of Willie LeRoy Dixson by use of a knife.

Trial on both counts of the information commenced May 16, 1960, and, on May 27, 1960, a jury returned separate verdicts of guilty on each count and a special verdict on count 1 that the death penalty be inflicted. Judgment and sentence of death on count 1 and of life imprisonment on count 2 were imposed July 18, 1960, with the execution of the death sentence to have precedence over the sentence imposed on count 2. We affirmed the judgment and sentence on appeal September 25, 1962. *State v. White,* 60 Wn. (2d) 551, 374 P. (2d) 942. After considering the petition for

rehearing and the answer thereto, we denied a rehearing March 13, 1963, and certiorari was denied by the Supreme Court of the United States, 375 U. S. 883, 11 L. Ed. (2d) 113, 84 S. Ct. 154 (October 21, 1963).

Petitioner here asserts his grounds for relief from the death sentence by way of habeas corpus in paragraph 3 of his petition, as follows:

"The judgment and sentence of December 26, 1963, whereby petitioner was sentenced to death is void for the following reasons:

"1. The Fourteenth Amendment prohibits the State from inflicting the death penalty for an act requiring criminal intent committed at a time when the accused was unable to control his behavior because of a lifelong mental illness and, therefore, unable to exercise free will in relation to the act.

"2. Petitioner, at the time of trial, could not effectively assist in his defense by way of testimony, demeanor or assistance to his counsel because of his mental illness.

"3. Petitioner was denied equal protection of the law and due process under the United States Constitution when the deputy prosecuting attorney at the trial was given the sole discretion to elect to instruct the jury that the State was demanding the death penalty in this case."

We made a full report of the facts in the case in our opinion on the appeal, and our review of the record now shows that we did not overstate them. *State v. White, supra.* No doubt whatever exists that the jury which imposed the death penalty on petitioner had before it a reliable picture of the defendant's actions in committing a series of brutal and unconscionable crimes. The evidence proved that, having earlier obtained, by means of a burglary, a Yesler Housing Project badge—the kind customarily worn by attendants at and about the project premises—petitioner, in one of the laundry units of the project, shortly after 7 a.m., brutally committed the acts of murder on his victim by striking her in the face and battering her head upon the concrete floor. He thereupon committed rape upon her unconscious or semiconscious body, and robbed her of her watch and ring. After concealing his victim in a

small storage room of the laundry premises and while pretending to wash some clothes, he coolly carried on casual conversations for more than an hour with other residents of the project who came and went in the course of doing their laundry. A few hours later, using an assumed name, he pawned his victim's watch and ring for about $9.

That evening, at about 10 p.m., after he had accompanied his acquaintance Willie Dixson to the Dixson home where they were to make some eggnog, petitioner stabbed his acquaintance to death and threatened to kill his victim's wife. She escaped her house by breaking out a bedroom window through which she left the premises.

Adverting now to the specific grounds urged by petitioner, he first contends that the fourteenth amendment of the United States Constitution prohibits his execution for an act requiring criminal intent committed at a time when accused was unable to control his behavior because of life-long mental illness. Expressed in a different way, petitioner says that he cannot be held accountable for acts which, having no free will, he could not prevent or avoid.

On the question of mental responsibility and criminal culpability, the trial record shows that the petitioner was allowed the widest latitude in presenting evidence of incidents and events relating to his personal history, family and social relationships, mental, emotional and physical developments, and social reactions beginning with his very early childhood. The examination and studies of petitioner's personality, and mental and emotional status covered every pertinent phase and aspect of his life. Several highly-trained and educated experts in the fields of psychiatry, psychology, sociology and neurosurgery, called by petitioner as witnesses in his behalf, testified at his behest. We mention four specialists presented by him.

Dr. Charles A. Mangham, a psychiatrist specializing in the treatment of children, had studied petitioner's history and personality in 1951, when petitioner was 14 years of age, on a referral and request from the Ryther Child Center, an agency then having jurisdiction of petitioner. His testimony at the trial concerning petitioner's personality and

behavior, derived from studies and observation of petitioner's personality, conduct and history, covers 12 pages of the statement of facts. Arthur V. Lamphere, Ph.D., a certified psychologist, gave petitioner the Wechsler adult intelligence scale test, the Bender-Gestalt test, the Minnesota multiphasic test, a Thematic Apperception test, and a Rorschach test, and made detailed studies of petitioner's personal history. His testimony runs to more than 50 pages.

Dr. G. Charles Sutch, a specialist in mental diseases and a diplomate of the American Board of Psychiatry and Neurology, examined the petitioner several times professionally; his testimony covers more than 25 pages of the statement of facts.

Dr. Lawrence Schwartz, likewise a specialist in psychiatry, studied and evaluated petitioner's personal history and records, his career in school and other public institutions, and his relationships with family, friends and society in general. He conducted a detailed psychiatric study and evaluation of the petitioner, and his testimony to the court and jury concerning his observations, conclusions and opinion fills about 45 pages.

Two psychiatrists, Dr. S. Harvard Kaufman and Dr. Walter J. Garre, called in rebuttal, covered similar aspects of the petitioner's personal history and mental and emotional development. Each examined the petitioner's institutional records, personal data, and psychological test results, and gave the jury their observations, conclusions and opinions. Dr. Kaufman's evidence filled 15 pages of the record and that of Dr. Garre, 24 pages.

■ If, by the first grounds of relief to the effect that petitioner cannot be held culpable because mental disease rendered him powerless to control his behavior, petitioner asks for relief under the so-called Durham, or irresistible-impulse, rule (*Durham v. United States,* 214 F. (2d) 862), we must point out that this court has steadfastly rejected the doctrine, and the trial court properly instructed the jury that irresistible impulse is not mental irresponsibility under the law. We said this by categorically declining to apply the doctrine and explicitly reaffirmed the M'Naghten rule

as the law of this state when considering petitioner's appeal from the judgment and sentence of the superior court. *State v. White*, 60 Wn. (2d) 551, at pp. 588 through 592, 374 P. (2d) 942, 964 through 967.

■ Nor is the irresistible-impulse doctrine under the Durham rule, either in essence or in one of its variations, to be applied by the jury separately on the question of the death penalty. In the collective conscience of the jury rests the answer to the momentous question as to whether one convicted of murder in the first degree shall suffer death. The jury makes this fateful decision from the whole evidence in the case, and from all of the instructions in the case including the instructions on mental irresponsibility and insanity under M'Naghten. Procedure in fixing or denying the death penalty is governed by statute (RCW 9.48.030) which requires a special verdict returnable with a general verdict in capital cases. And, likewise, where a plea of insanity or mental irresponsibility be interposed in a capital case, if the verdict is for acquittal, the jury shall, at the same time, return special verdicts on the present existence and probable continuance of the mental illness. RCW 10.76.030. Thus, all of those ultimate decisions consigned by statute to the jury in capital cases, including inflicting of the death penalty upon the verdict of guilty and special findings upon a finding of not guilty by reason of mental irresponsibility, derive from the whole case without separate or additional post-verdict hearings. The jury makes these decisions from the entire evidence.

We studied the Durham rule and its variations, including the irresistible-impulse doctrine in *State v. Collins*, 50 Wn. (2d) 740, 314 P. (2d) 660, and made a detailed listing of the authorities and literature on the subject. Our opinion declared without qualification that irresistible impulse is not a defense and we expressly sustained an instruction which said so, citing *State v. Maish*, 29 Wn. (2d) 52, 185 P. (2d) 486, 173 A.L.R. 382. Our opinion was not fortuitous.

It followed a searching scrutiny of the most strongly held and vigorously advocated doctrines on the subjects of mental irresponsibility, mental capacity and criminal culpa-

bility, but our opinion, nonetheless, in *Collins, supra,* rejected the Durham rule, the irresistible-impulse doctrine, and the American Law Institute's proposed alternative standards in its Model Penal Code, and affirmed the M'Naghten rule as the law of this jurisdiction. Our later adherence to M'Naghten and rejection of Durham in *State v. Murphy,* 56 Wn. (2d) 761, 355 P. (2d) 323, 83 A.L.R. (2d) 1061, strongly supports the *Collins* case, *supra.* Accord: *State v. Maish, supra.* A careful reading of the *Collins* case, *supra,* does, we think, answer most of the questions now raised by petitioner in his first ground for relief.

Accordingly, we see no denial of petitioner's rights under the fourteenth amendment to the Constitution of the United States in the trial court's denial of irresistible impulse or other variations of the Durham rule *(Durham v. United States,* 214 F. (2d) 862) neither as a defense to the charges whereof petitioner was convicted, nor to be applied by the jury in determining if the death penalty be inflicted.

Petitioner cites *Robinson v. California,* 370 U. S. 660, 8 L. Ed. (2d) 758, 82 S. Ct. 1417, in support of his argument that one cannot be held criminally liable for acts committed while unable, through the exercise of will, to control or curb one's impulses. He says that, if one cannot control his impulses even though he knows them to be criminal, and therefore wrong, it is tantamount to punishing him for having a disease.

We do not see how *Robinson v. California, supra,* is pertinent to the present inquiry or supports petitioner's position in any degree. That case merely held that a California statute purporting to make it a criminal offense punishable by imprisonment for one to be addicted to the use of narcotics inflicts cruel and unusual punishment in violation of the eighth and fourteenth amendments to the Constitution of the United States. That statute sought to punish as a crime the mere status of narcotic addiction without requiring as an element any actions or behavior by the accused. Rationale of the case seems to be summed up in the following language:

"It is unlikely that any State at this moment in history would attempt to make it a criminal offense for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease. A State might determine that the general health and welfare require that the victims of these and other human afflictions be dealt with by compulsory treatment, involving quarantine, confinement, or sequestration. But, in the light of contemporary human knowledge, a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. . . ."

Following the foregoing case, the Supreme Court of California upheld enforcement of periods of involuntary confinement for the purpose of treating narcotic addiction in *In re De La O*, 28 Cal. Rptr. 489, 378 P. (2d) 793 (1963).

■ Petitioner's present plight can in no wise be said to come within the *Robinson v. California, supra,* holding, nor has the State of Washington sought in any way to punish him for his status or condition. The judgment and sentence are imposed upon the petitioner for his actions in violation of the criminal code.

We have one additional thought on this point. If petitioner means by his first ground for habeas corpus that, in lacking free will to control his behavior by reason of mental disease, he comes within the requirements of the M'Naghten rule defining mental irresponsibility and insanity, the jury, we find, was fully instructed upon the subject and the whole point reviewed on appeal (*State v. White, supra*), and we found no denial then and do not find now any denial of his constitutional rights or error in his trial.

Petitioner's second ground for habeas corpus sets up denial of equal protection of the laws and denial of due process under the sixth and fourteenth amendments to the United States Constitution and Art. 1, § 22 (amendment 10) to the State Constitution, in that at the time of trial he was unable to effectively assist in his defense by way of testimony and because of a damaging demeanor and attitude due to mental illness.

He supports this ground, *inter alia,* with an affidavit from the trial judge which says, in part

"At the time of trial the defendant was of an unprepossessing appearance. He exhibited no apparent signs of culture or background or consideration for others."

in May of 1960. The affidavit says that about 3 years later when petitioner, on April 1, 1963, came before the trial judge for the fixing of a new execution date, the defendant said, according to the judge's affidavit,

". . . that he was grateful for having been given a fair trial; . . . and that we may all learn something which will be of benefit to others who commit similar crimes. He again thanked the court for a fair trial and for the fairness exhibited by counsel for the state."

The trial judge went on to say that he had never

". . . heard so fine and considerate a statement by any defendant in open court. . . . defendant exhibited poise, a friendly manner . . . [and] appeared to be an entirely different person than the man who had stood trial three years before. . . ."

Counsel for petitioner likewise made affidavits that, during the trial, petitioner appeared hostile, aggressive and indifferent to his fate.

■ We have read the petitioner's testimony given at the trial when he took the witness stand in his own defense. It covers more than 60 pages of the statement of facts and from it we cannot find that, due to mental illness or otherwise, he was unable to effectively assist his counsel in the defense of the cause, nor did he deprive his counsel of effective help in their defense efforts because of his demeanor or attitude. That some of his testimony was evasive and indefinite is understandable in light of his terrible crimes— the numerous details of which he had earlier given to the police.

Petitioner's right to appear and participate in his defense was at no time restricted, curbed or fettered. In the absence of a mental or physical illness of sufficient gravity to warrant staying the trial, neither the court nor the state possesses any means by which the emotional or mental

resources of one accused of a capital offense may be enhanced. If he is mentally responsible for his behavior, he is in law as he makes himself to be. We find neither *Wilken v. Squier,* 50 Wn. (2d) 58, 309 P. (2d) 746, nor *State v. Murphy,* 56 Wn. (2d) 761, 355 P. (2d) 323, cited by petitioner, to be in support of his position.

Thus, considering all of the affidavits and the complete record of trial, we hold the second ground urged by petitioner to be without merit.

This brings us to the third and final ground urged in the petition. Petitioner says that he was denied equal protection of the laws and due process of law under the United States Constitution when the deputy prosecuting attorney was— as petitioner puts it— given the sole discretion to elect to instruct the jury that the state was demanding the death penalty.

█ Petitioner is mistaken when he assumes that infliction of the death penalty in trials involving capital cases is in any way discretionary with the prosecuting attorney, or his deputies, conducting the trial for the state. Such discretion vests neither in counsel nor the court, but solely in the jury. The jury and the jury alone makes this finding.

RCW 9.48.030 reads:

"Murder in the first degree shall be punishable by imprisonment in the state penitentiary for life, unless the jury shall find that the punishment shall be death; and in every trial for murder in the first degree, the jury shall, if it find the defendant guilty, also find a special verdict as to whether or not the death penalty shall be inflicted; . . ."

Under this statute, the jury by law, upon its finding of guilty of murder in the first degree, *shall* return a special verdict on the question of the death penalty. Petitioner cites us no authorities which hold that the state may not, in capital offenses, advocate the extreme penalty to the jury. Nor do we know of any rule which prevents the defense from arguing against the death penalty, as was done by petitioner's counsel at trial with great force and eloquence. That the trial court recognized and gave effect to the jury's

exclusive discretionary powers on the subject of the death penalty is evident from its brief instruction to the jury on the matter. See *State v. White, supra,* at pp. 570-573.

"In the event you find the defendant guilty of murder in the first degree as to Count I, it will then be necessary for you to return a special finding as follows:

" 'Shall the death penalty be inflicted?'

"This special finding must be answered 'yes' or 'no', according to the determination you reach."

In our opinion, the foregoing instruction, brief, straightforward and unqualified, vested sole and exclusive discretion in the jury on the question of whether the death penalty be inflicted.

The petition for a writ of habeas corpus is, therefore, dismissed and the writ denied.

OTT, C. J., DONWORTH, WEAVER, ROSELLINI, and HAMILTON, JJ., concur.

ROSELLINI, J. (concurring)—I have signed the majority opinion; however, I wish to add that I concur with the view expressed in the first paragraph of Judge Hunter's dissent, that the imposition of punishment of murder in the first degree is in the province of the jury. This court has never had the power to change the severity of a sentence as one of the dissenting opinions suggests that we do in this case. Never in its history has the court attempted to do so. It is for the legislature to determine what sentences may be imposed (so long as it does not provide for the inflicting of cruel and unusual punishment), and for the jury to determine whether, in a given case, the ultimate punishment shall be inflicted. The substitution by this court of its judgment on the question would do violence to the concept that this is a nation governed by laws and not by men.

HAMILTON, J. (concurring)—I have signed the majority opinion and concur in the result.

In doing so, however, I wish it to be noted that consideration has been accorded to the contention of petitioner as defined and expressed in Judge Hill's dissent. As that

contention is expressed by Judge Hill, it is reduced to the assertion that petitioner was denied due process of law because the jury was not *affirmatively* instructed that it could consider all of the evidence before it upon the issue of punishment.

In the instant case, I do not believe the absence of such an instruction constitutes a violation of due process of law. My reasons in so concluding are:

(1) At the trial the petitioner was accorded the widest latitude in presenting evidence of his personal, family, social, mental, and emotional background;

(2) The jury was not expressly instructed it could not consider such evidence in relation to punishment; nor was any request made of the trial judge that he affirmatively instruct the jury that it should so consider such evidence;

(3) Counsel argued such evidence to the jury upon the issue of punishment; and

(4) Human nature being what it is, and the issue being life or death, it is unrealistic to suggest that the jury did not consider all of the evidence before it in arriving at its decision.

HILL, J. (dissenting)—I dissent. I am in accord with the majority opinion as to the second and third grounds of relief urged by the petitioner.

I am of the opinion that the petitioner has been denied due process so far as the sentence of death is concerned.

I concurred specially in the majority opinion in *State v. White* (1962), 60 Wn. (2d) 551, 374 P. (2d) 942. I agreed then, and I agree now, that the M'Naghten test was properly applied in determining the guilt or innocence of the defendant and that, on that issue, the defendant had a fair trial, and the verdict of guilty cannot be successfully assailed. Such a verdict carries with it a sentence of life imprisonment, unless the death penalty is imposed. My concurring opinion suggested that the M'Naghten test be applied in the determination of guilt or innocence, but that psychiatric testimony and evaluation be freely employed by the courts in determining the disposition and treatment of

the offender. I repeat again a quotation from a concurring opinion of Chief Justice Weintraub in *State v. Lucas* (1959), 30 N. J. 37, 152 A. (2d) 50:

" 'For all practical purposes the furor over *M'Naghten* is confined to the disposition of offenders convicted of murder. It is the death penalty which sparks the quarrel. Whatever may be their thesis of personal blameworthiness and of justice to the individual, I should think that all thoughtful persons would at least pause when judging a man at the portal of death. All doubts must congregate there. The ultimate responsibility with respect to capital punishment is, of course, legislative. But there is an area within the present statutory scheme in which the judiciary can and should move to accommodate the divergent views. I refer to the admission of full psychiatric testimony for the jury's consideration in determining whether a man should live or die.

" 'I have no doubt that such testimony belongs in the case for that purpose. I am convinced the Legislature so intended when in resolving a controversy over capital punishment it provided that the jury shall fix the punishment. *State v. White*, 27 N. J. 158 (1958). The mental condition of a man is so inseparable from the issue of a just disposition—just to him and to society—that it is inconceivable that the Legislature intended to exclude it.

" 'The functions of the mind are an integral part of the criminal event itself. The law requires a *mens rea*. The specific mental operations necessary for guilt, be they premeditation, deliberation, and willfulness, or a felonious intent in a felony murder, cannot be isolated from the total functions of the mind of the offender. To limit the proof to that part of the total mental activity which technically bears upon the issue of guilt is to conceal part of the event itself. The whole truth should be disclosed so that in deciding the question of life or death the jurors will know who it is who stands before them. That disclosure is necessary for the moral judgment the jurors must reach.' "

(See also his article "Psychiatry and Criminal Responsibility," American Bar Ass'n Journal, November, 1963.)

It would be agreed that a trial judge in a noncapital case would not ordinarily exercise his discretion in the matter of a sentence either after a verdict of guilty or a plea of

guilty without a complete presentence investigation and report.

Surely when the matter of imposing sentence is left to a jury in a capital case, they too should have the opportunity to know all that there is to be known about the defendant that has any bearing on whether he should be sentenced to death or life imprisonment—the only choice available to them.

Since we have no provision, as do California and Pennsylvania, for the taking of additional testimony in a capital case after the verdict,[1] considerable latitude is allowed in the admissibility of evidence in such cases so that the jury may not only determine the issue of guilt, but have the information needful for consideration in pondering the issue of death or life imprisonment.

The petitioner does not here complain that any evidence offered by him bearing on that issue was excluded. His contention is that certain instructions to the jury excluding lack of volition and irresistible impulse, if proper on the issue of guilt or innocence,[2] had the effect of excluding these psychiatric concepts from the consideration of the jury on the issue of what the sentence should be, *i.e.*, death or life imprisonment.

With this very narrow but very vital contention, the majority never really comes to grips.

It is now presented to us for the first time; and all that we have said in *Maish, Collins, Murphy, White, et al.*, is simply beside the point, because we are no longer considering the issue of guilt or innocence, but are considering the propriety of the consideration of evidence which, while

---

[1]Split-verdict procedure was first adopted in California and then, in 1959, in Pennsylvania to make possible the presentation to the jury, fixing the penalty, such factors as might be relevant thereto. The state could then show the prior criminal record, the character and atrocity of other offenses and other relevant details. The defense could show mitigation, environment, motive, mental defect, provocation, the age of the defendant and other relevant details.

[2]*State v. White, supra; State v. Collins* (1950), 50 Wn. (2d) 740, 314 P. (2d) 660; *State v. Maish* (1947), 29 Wn. (2d) 52, 185 P. (2d) 486, 173 A.L.R. 382.

properly branded as irrelevant on that issue, is definitely relevant on the issue of what should be done with this man whose guilt has now been determined.

The cases agree that inasmuch as it has been determined by the jury that the defendant is guilty, he is entitled to have his sentence determined on the basis of the entire case.

In the present case, the only statements to the jury concerning their responsibility in the imposition of the death penalty, were contained in instructions Nos. 37 and 40 and were as follows:

"You are instructed that in every trial for Murder in the First Degree, the jury shall, if it finds the defendant guilty, also find a special verdict as to whether or not the death penalty shall be inflicted, and if such special verdict is in the affirmative, the penalty shall be death." Instruction No. 37.

"    .   .   .

"In the event you find the defendant guilty of Murder in the First Degree as to Count I, it will then be necessary for you to return a special finding as follows:

"  'Shall the death penalty be inflicted?'

"  'This special finding must be answered 'yes' or 'no,' according to the determination you reach.'  " Instruction No. 40.

Instructions Nos. 33[3] and 35[4] correctly excluded any consideration of irresistible impulse or lack of volition, insofar

---

[3] "You are instructed that the term 'mental irresponsibility,' as used alternatively with the term 'insanity' in the further plea of the defendant and elsewhere in these instructions, means what is defined in law as criminal insanity. Therefore, if you find that the defendant was mentally irresponsible under the definition as contained herein, you must find the defendant not guilty by reason of mental irresponsibility.

"If the defendant is to be acquitted upon his plea of mental irresponsibility or insanity, he must convince you by a preponderance of the evidence that, at the time the crime is alleged to have been committed, his mind was diseased to such an extent that he was unable to perceive the moral qualities of the act with which he is charged, and was unable to tell right from wrong with reference to the particular act charged. A person may be sick or diseased in body or mind and yet be able to distinguish right from wrong with respect to a particular act." Instruction No. 33

[4] "Irresistible impulse is not mental irresponsibility within the meaning of the law and is no defense. An irresistible impulse, as used herein,

as the issue of guilt or innocence was concerned; but these instructions also, for all practical purposes, removed these concepts from the consideration of the jury on the issue of what the sentence should be.

Certainly a defendant, under a statute such as ours, is entitled to an instruction that a jury may consider all the evidence, including all the psychiatric testimony, unfettered by any legal or medical concept of insanity on the question whether the penalty shall be death or life imprisonment.[5]

Less than that, in the case of the imposition of the death penalty, seems to me to be a denial of due process because it is a violation of the fundamental principles of justice which lie at the base of our civil and political institutions. See *Palko v. Connecticut* (1937), 302 U. S. 319, 82 L. Ed. 288, 58 S. Ct. 149. There is here no seismic innovation. The symmetry of the edifice of justice would be greater than it was before.

Since this is a dissent, any modus operandi is academic, and so I merely suggest what seems to me a logical solution to the problem.

Since it is now impossible to remand the issue of the sentence to the jury, which alone could inflict the death penalty,[6] the death penalty cannot be inflicted and the

---

is an impulse induced by, and growing out of, some mental disease affecting the volitive, as distinguished from the perceptive, powers, so that the person afflicted, while able to understand the nature and consequence of the act charged against him and to perceive that it is wrong, is unable, because of such mental disease, to resist the impulse to do it.

"It is to be distinguished from such a disease of the mind as renders a person unable to appreciate the nature and character of the act charged, and to understand whether it is right or wrong." Instruction No. 35.

[5]The failure to give such an instruction is not a reflection on the trial judge. It was not requested. It probably has never been given. It is suggested, for the first time in this state in this dissent, as a requirement of due process. The judge handled this trial with exceptional skill and with complete fairness to the defendant under our prevailing standards. I here merely express the view that these standards should be higher.

[6]A considerable number of the states provide, in capital cases, for a given penalty unless the jury by its verdict imposes another. In a

matter should be remanded to the superior court to impose the only sentence which can now be entered upon the verdict of guilty, *i.e.,* a life sentence. The following are a few of the cases in which a death penalty has been reduced to life imprisonment by a reviewing court. *State v. Ramirez* (1921), 34 Idaho 623, 203 Pac. 279, 29 A.L.R. 297; *Commonwealth v. Green* (1959), 396 Pa. 137, 151 A. (2d) 241; *Commonwealth v. Garramone* (1932), 307 Pa. 507, 161 Atl. 733, 89 A.L.R. 291.

I would, as indicated, vacate the death penalty for want of due process in its imposition and remand the case for the imposition of a life sentence.

FINLEY, J. (dissenting)—I signed the dissent by Hunter, J., in *State v. White* (1962), 60 Wn. (2d) 551, 374 P. (2d) 942, and still subscribe to its reasoning and the results thereby envisaged. In the present habeas corpus proceeding, I am strongly influenced by the reasoning and dissenting views expressed by Hill, J. However, the end result there contemplated seems to me to raise conflicting considerations respecting judicial, legislative and executive power and authority, and presents procedural problems and obstacles which, in my judgment, seem most difficult, if not insurmountable, and should be avoided. I think that now in the present proceeding, sua sponte, pursuant to the inherent power of this appellate court in furtherance of our appellate jurisdiction, and without regard to limitations as to what matters or issues usually are or may be presented to us on habeas corpus, this court should grant a new trial in this case. The reasons and purposes of such a new trial have been expressed previously—and well—in the dissenting opinion by Hunter, J., mentioned hereinbefore.

HUNTER, J. (dissenting)—I first address myself to the dissent of Judge Hill. The dissent vacates the death pen-

---

majority of these states the statute imposes the death penalty, unless the jury changes it to life imprisonment; in two states (Washington (RCW 9.48.030) and New Hampshire (Revised Laws, Chapter 455, §§ 4 and 5) the penalty is life imprisonment, unless the jury inflicts the death penalty.

alty and remands the case to the trial court for the imposition of a life sentence. There is no statutory or case law permitting such a procedure in this state. The imposition of punishment, in the event of a finding of premeditated homicide, is solely within the province of the jury. RCW 9.48.030. The jury's determination on the question of the defendant's guilt and punishment in such a case is a part and parcel of the same proceeding, and cannot be determined in separate trials. Criminal cases cannot be tried piecemeal. If the defendant had been denied due process of law in the consideration of the penalty, he would have been denied a fair trial, and the case must then be remanded for a new trial on all issues charged in the information.

Addressing my remarks to the majority opinion, I am in disagreement. I believe that the reasoning in the recent case of the United States Supreme Court in *Robinson v. California,* 370 U. S. 660, 8 L. Ed. (2d) 758, 82 S. Ct. 1417 (1962) is controlling here. The case holds that to punish a person who is not responsible for his condition, where there is no culpability, constitutes cruel and unusual punishment in violation of the eighth and fourteenth amendments to the United States Constitution.

It was the contention of the defendant's counsel that by reason of the defendant's diseased mind he was incapable of controlling his conduct when he committed the criminal acts for which he was charged; that there was no mens rea, or guilty mind; that there was no culpability; and that the defendant is being punished for conduct over which he had no control. The psychiatric testimony was virtually undisputed that by reason of a diseased mind the defendant was incapable of control over his conduct. Consideration of this testimony in determining guilt or innocence was ruled out by the trial court's instruction that this issue must be determined on whether the defendant knew the difference between right and wrong when he committed the criminal acts.

For the above reasons, and as stated in detail in my dissent in *State v. White,* 60 Wn. (2d) 551, 374 P. (2d) 942 (1962),

I believe the defendant was not afforded a fair trial; that he was denied due process of law under both the state and federal constitutions; that under the reasoning of the *Robinson* case, *supra,* had the jury found the defendant could not control his conduct by reason of a diseased mind, the imposition of punishment would have contravened the eighth amendment to the United States Constitution prohibiting cruel and unusual punishment. *Robinson v. California, supra.*

The case should be remanded for a new trial.