[No. C. D. 4687.   En Banc.   August 19, 1965.]

*In the Matter of the Disciplinary Proceeding Against,*

ARTHUR EBER SHERMAN, JR., *an Attorney at Law.**

*T. M. Royce,* for Board of Governors.

*Bassett, Donaldson & Hafer,* for respondent.

*The Attorney General* and *George Neff Stevens, amici curiae.*

HILL, J.—Different facets of this disciplinary proceeding, which began November 20, 1958, have been before this court. Two opinions have been written,[1] the substance of which was to hold that Arthur Eber Sherman, Jr., was entitled to a hearing on his defense of mental irresponsibility.

*Reported in 404 P.2d 978.

[1]58 Wn.2d 1 and 7, 354 P.2d 888, and 363 P.2d 390 (1961).

█ As a consequence of the hearings held on that issue, both the special trial committee and the Board of Governors of the Washington State Bar Association have concluded that Mr. Sherman has sustained the burden of establishing his mental irresponsibility at the time of the commission of the offenses with which he was charged in this proceeding.[2] The Board says that his "conduct was the result and consequence of his mental incompetency," while the special trial committee said that his offensive acts "were the product and the result" of his mental disorder. We accept these findings, and that is, of course, decisive of the question of whether Mr. Sherman should be disbarred or disciplined for that conduct.

The issue now becomes, on the basis of his present mental condition: Should we disbar Mr. Sherman, suspend him pending further developments, or permit him to continue practicing law.

No one is suggesting that Mr. Sherman should be disbarred because of his present mental condition. The Board of Governors has recommended that he be suspended from the practice of law until such time as he shall prove that the mental condition which was responsible for his misconduct "has been cured so completely that there is little or no likelihood of a recurrence of the condition."

The special trial committee was unanimously of the opinion that Mr. Sherman was not presently incapacitated from practicing law, and that he should be neither disbarred nor suspended, but permitted to practice law. However, two members of the committee attached a condition of voluntary psychiatric aid and consultation for a 3-year period.[3]

---

[2] Making a false statement in his application for admission to practice law (December 5, 1956), filing two petitions for rehearing with the Supreme Court of Oregon (December 4, 1957), and sending a letter to a trial judge in Oregon (February 28, 1958), all of which were insulting and contemptuous (copies of the letter were also sent to other parties). For a more detailed discussion of Mr. Sherman's conduct, see 58 Wn.2d 1.

[3] The following is a portion of the findings of two members of the special trial committee:

"The Trial Committee believes and finds that at the time of committing the offensive acts listed in the complaint, Mr. Sherman was

The other member of the committee, while believing that the psychiatric aid would be beneficial, did not believe it should be made a condition of Mr. Sherman's continuing in the practice of the law.[4]

We are in accord with the conclusion of the special trial committee. The best evidence that Mr. Sherman is not presently incapacitated from practicing law is that he has been practicing in Pacific County since September, 1958, and, apparently, capably and competently representing his clients. He is presently serving as the judge of the police court in the city of Raymond (appointed by the mayor and

suffering from a form of mental or personality disorder (the testifying psychiatrists variously branded it as 'paranoia,' 'paranoid trend,' and 'paranoid personality'), and such offensive acts were the product and result of that disorder. We further find that Mr. Sherman is not yet so fully cured or rehabilitated as to render improbable some future manifestation of that disorder, although one cannot predict the gravity, seriousness or exact form of such future manifestation. Nevertheless, we find that Mr. Sherman has made progress and adjustment; that except for several minor emotional flareups he has been functioning as a lawyer and a citizen without complaint since moving to South Bend in 1958; . . . In other words, the Committee believes that Mr. Sherman's mental illness still exists, but not to a *presently incapacitating degree*—that the existing attitudes of defensiveness and persecution, though present, are essentially quiescent now, and that with help Mr. Sherman can properly function. Absent such help, if subjected to extreme personal setbacks and disappointments, it is quite probable that he will be unable to maintain a realistic and balanced perspective and will be unable to creditably function as a lawyer." (Italics ours.)

[4]The following is a quotation from the report of the third member of the special trial committee:

"Assuming that the Court were to generally agree with our basic conclusions, the Court might well find that Mr. Sherman could give or had given satisfactory personal assurances that he would obtain the sustaining medical help which . . . I believe necessary to his continuing and future stability and success. But, if the Court determines further assurances are necessary, I feel the result could be obtained by agreement, along the lines of an agreed order continuing the present proceedings pending such medical program and future medical reports.

"If our rules now necessitate undesirable public notice, (Note that secrecy cloaks the record of an 'acquitted' lawyer—R.D.A. VIII, (D)) it would seem that the Court, exercising its inherent power, could change its rules immediately, to avoid that publication and to accomplish justice. See In Re Levy, 23 Wn. (2d) 607, in which the Court recognized its power to change its rules 'at any time.' "

confirmed by the city commission). This appointment became effective in January, 1965, and is not a part of the record before the court, but it is a matter of public record of which we take judicial notice.

Mr. Sherman, in addition to his record of active practice in Pacific County, presented a rather imposing array of responsible businessmen and civic leaders who testified concerning his standing in the community where he has been practicing. Their testimony also covered his activities in community, church, and civic affairs, which included being the president of the chamber of commerce and one of the service clubs.

Against this, the Bar Association relies on the somewhat conflicting views of the psychiatrists, coupled with—and to some extent based upon—four incidents referred to as the Melendy, the Snowball, the McCoy, and the Duree episodes.[5] In each of these episodes, Mr. Sherman is said to have lost control of himself and demonstrated emotional instability.

It is interesting to note that Mr. Melendy and Mr. Duree both say that, notwithstanding the episodes in which they were involved, they still regard Mr. Sherman as a capable lawyer. Mr. Duree appeared as amicus curiae to urge that Mr. Sherman be permitted to continue to practice law. It is apparent that none of these incidents constitute any failure to protect the interests of a client, or reflect directly upon his conduct as a member of the bar.

The special trial committee seems to have regarded these incidents as of little significance in determining whether Mr. Sherman was presently capable of practicing law.[6]

---

[5]He used force to take from Mr. Melendy, and retain, a plat which he had prepared as an engineer. (Mr. Sherman is qualified to do civil engineering and he holds a bachelor and master's degree in forestry from the University of Michigan.) He used force and threatening language (the extent of the force and the character of the language is in dispute) toward some teen-age boys who he thought had thrown a snowball at his car. He slammed a door on leaving Mr. McCoy's office, after he thought Mr. McCoy had ignored him. He wrote a letter discharging Mr. Duree as his attorney because he thought Mr. Duree was protecting interests other than his own.

[6]Probably because of acquaintanceship with lawyers who use force, even in the courtroom, to halt vituperative abuse from opposing counsel,

However, the Board of Governors has made each one of them the basis of a lengthy finding of fact to support its conclusion that Mr. Sherman has failed to establish that the mental condition, which was responsible for his misconduct, has been cured so completely that there is little or no likelihood of a recurrence of the condition.

This attitude toward the episodes explains the divergent recommendations made by the special trial committee and the Board of Governors. The special trial committee was concerned with whether Mr. Sherman was presently capable of practicing law and able competently to represent his clients and protect their interests. The Board of Governors apparently felt that they were bound by the express language of our opinion of July 6,[7] and that unless Mr. Sherman could sustain the burden of proving that the mental condition, which was responsible for his misconduct, had been cured so completely that there was little or no likelihood of a recurrence of the condition, he could not be permitted to practice law.

The statement from that opinion, quoted in footnote 7, would lead to the conclusion that if Mr. Sherman failed to

---

or smash photographic equipment in courthouse corridors, or resent being snowballed, or even slam doors and, yet, are still regarded as competent to practice law.

[7] "Likewise, at the suggestion of *amici curiae* and for the guidance of the panel hearing this matter and also the Board of Governors, we indicate our present acceptance of the following propositions:

"A. Mental irresponsibility is a complete defense to conduct of an attorney which would otherwise warrant disciplinary action: (1) if such conduct was the result or the consequence of mental incompetency; and (2) if the mental condition which was responsible for such conduct has been cured so completely that there is little or no likelihood of a recurrence of the condition. The burden of proof of this defense, in all of its aspects, is upon the respondent attorney.

"B. If the respondent attorney is able to carry the burden of proof as to his mental irresponsibility at the time of the conduct of which complaint is made, but is unable to prove recovery to the extent indicated in "A" and the court has reason to believe that such recovery is possible, he will be suspended until such time as he can prove such recovery—otherwise, he shall be disbarred." *In re Sherman,* 58 Wn.2d 1 and 7, 354 P.2d 888, and 363 P.2d 390 (1961).

sustain that burden, only two courses of action were open to the Board of Governors.

1. If there was reason to believe that recovery was possible, he would be suspended until such time as he could prove that there was little or no likelihood of a recurrence of the condition which led to the misconduct;

2. If there was no possibility of recovery, he would be disbarred (not because of the misconduct, but because he was incompetent to practice law).

The Board, believing that Mr. Sherman had not sustained the burden of showing that there was little or no likelihood of a recurrence of the condition which induced his misconduct, but that there was a reason to believe that he might recover to that extent, therefore recommended a suspension until that burden should be sustained.

If it be conceded that Mr. Sherman had failed to sustain that burden, the Board of Governors was "locked in" by our opinion; it could only disbar or conditionally suspend.

We will concede for our present purposes, that, based on the testimony of the psychiatrists,[8] Mr. Sherman did fail

---

[8]Dr. Ralph M. Stolzheise (called by the Bar Association, and who had not had the opportunity of examining Mr. Sherman), when questioned on the probability of a recurrence of the condition which caused the conduct upon which this disciplinary proceeding was predicated (see note 2) testified: "As to a likelihood or probability, I can't say, but there is a strong possibility."

Asked about the likelihood of sending petitions and a letter, such as those referred to in note 2, he said: "Time tends to dissipate that pattern but there is too much submerged emotion here in this man's general thinking and feeling to have confidence he would keep it submerged."

He said that Mr. Sherman had not been cured—"It has been fluctuating with periods of exacerbations" (referring primarily to the four episodes previously mentioned). He testified that Mr. Sherman would never be cured "unless he goes through diagnostic work in order to properly understand the origin of these feelings and practices in that understanding a new attitude toward himself and toward life around him. This sort of illness does not get well by itself."

He did express the view that with treatment Mr. Sherman could be helped, and "with sufficient treatment (3 years of a sustained therapy program) he could probably achieve a recovered status."

Dr. Lawrence H. Schwartz (called by Mr. Sherman, and who had examined him) was reluctant to give an opinion about the likelihood of a recurrence of the condition existing when Mr. Sherman committed

to sustain that burden and that the Board of Governors has recommended exactly the action which we said should be taken.

However, after studying the testimony of the psychiatrists, we are satisfied that our opinion of July 6, 1961, set up an almost impossible standard from a psychiatric standpoint, in requiring proof that there is little or no likelihood of a recurrence.[9]

We admit that alternative No. 2 (*i.e.*, disbarment for incurable mental illness) was a lapsus linguae and not expressive of our real intention.[9]

We appreciate that the Board of Governors in its recommendation felt obligated to follow literally, and was following, our prior statement. We are conscious, too, that if Mr. Sherman had told the truth in his application for admission to practice that the application would not have

the acts on which the disciplinary proceedings were based (see note 2). He testified: "I would say . . . there is less likelihood of a recurrence than ever before in his life, but predictability in psychiatric matters is notoriously poor, especially in cases like this." Then he added: "If I can enlarge, the reason predictability is so poor is that there is such an enormous variety of circumstances which will press upon the individual in his life and which will test his stability or lack of stability—if life is fairly smooth or if problems don't arise, he may go along the rest of his life without an acute episode."

Dr. Schwartz, too, stressed the importance of treatment, saying, "that with treatment there would be less likelihood of a recurrence of an acute illness."

He discussed "treatment" in terms of "psychotherapy aimed toward helping him to find and understand his problems. This could be done by any qualified therapist, it might not have to be a psychiatrist, but someone skilled to deal with such problems."

[9]A personal note: The writer of this opinion also wrote the other two opinions in 58 Wn.2d 1 and 7. I admit, frankly, that the standard laid down in the second opinion (see note 7) was psychiatrically inappropriate. Conscientious experts in the psychiatric field concede that there are too many imponderables in such cases and too much of the unpredictable to warrant a flat statement that there is "little or no likelihood of a recurrence."

I would point out, too, that the further suggestion that a person be disbarred (with its definite connotation of misconduct) because he is incurably mentally ill is not defensible. We would not disbar a lawyer because of incapability caused by any other illness, why should we disbar a person for mental illness?

been granted. However, all are now in accord with the proposition that his false answer and other misconduct "was the result and consequence of his mental incompetence." We are now of the view that the special trial committee concerned itself with the really relevant criteria, *i.e.*, (1) Is Mr. Sherman presently able capably and competently to represent his clients; to so conduct himself as to reflect no discredit upon his profession, and to maintain its standards; and (2) If so, is the probability of a recurrence of the condition, existing at the time of his misconduct, so great that he should presently be deprived of his right to practice his profession.

The record sustains an affirmative answer to (1) and a negative answer to (2). We agree with the special trial committee that Mr. Sherman should not be suspended or disbarred and that he should be permitted to continue to practice law, conditional upon his complying with the recommendation made by the special trial committee for voluntary treatment. The details of the treatment program will be the subject of a special order prepared by counsel for Mr. Sherman and counsel for the Washington State Bar Association.

We make this disposition of the case in reliance upon the assurance of his counsel that Mr. Sherman will voluntarily conform with the recommendation of the special trial committee.

FINLEY, WEAVER, HUNTER, and HAMILTON, JJ., concur.

ROSELLINI, C. J. (dissenting)—As the majority state, when this case was before the court before (*In re Sherman,* 58 Wn.2d 1, 354 P.2d 888, 363 P.2d 390), it was decided that the applicable rule should be:

Mental irresponsibility is a complete defense to conduct of an attorney which would otherwise warrant disciplinary action: (1) if such conduct was the result or the consequence of mental incompetency; and (2) if the mental condition which was responsible for such conduct has been cured so completely that there is little or no likelihood of a recurrence of the condition. The burden of

proof of this defense, in all of its aspects, is upon the respondent attorney.

This was a very liberal rule which we enunciated, much more liberal than the rule we apply in judging the conduct of a layman. See *In re White v. Rhay*, 64 Wn.2d 15, 390 P.2d 535. In my opinion, it gives the attorney the full benefit of the doubt as to his responsibility for his actions, and should not be liberalized further by relieving him of the necessity of showing that the illness which generated his misconduct has been cured.

In the proceeding before this court, there was definitely no showing that the respondent's mental illness (paranoid personality) has been cured. Insofar as the record shows, no cure has been attempted. Although this proceeding has been pending since 1958, and the respondent defends his highly reprehensible actions in falsifying his application for admission to practice and in making unseemly attacks upon the courts of Oregon with an assertion that he was a victim of mental illness, he has not sought psychiatric help. He merely promises to do so if he is not disbarred or suspended.

During the time that the respondent has been practicing law, it appears that he has committed no major offense of the type which paranoia induces, at least none that were brought to the attention of the trial committee. But "secretiveness" is a characteristic of paranoia, and we do not know what falsifications may have occurred and been concealed. It can be seen, from the record before us, in my opinion, that the respondent has not rid himself of all of his feelings of persecution or his tendency to duplicity.

For example, there is the matter of the appointment of an attorney to represent him in this proceeding. Rule 7 K, Discipline of Attorneys, RCW vol. 0, provides for the appointment of an attorney to represent a respondent if it appears that he is incapable of conducting a proper defense to the formal complaint against him. While it was and is the contention of the respondent that he is fully capable of practicing law (and has been since shortly after the time he falsified his application for admission), he insisted that an attorney be appointed to represent him. He discharged the

attorney who was appointed and who did represent him well and in evident good faith, protesting that he did not feel the attorney could represent him while he was also representing undesignated "conflicting" interests.

The respondent also insisted that a member of the trial committee was prejudiced against him, although he was not able to point to any evidence of such prejudice on the part of the committee member.

I have examined the record closely and find it devoid of any indication that the respondent realizes the seriousness of his offenses, that he truly regrets his action in falsifying his application, or that he feels now that it was unjustified. The respondent's appearances before the trial committee were, to my mind, characterized by a lack of candor consistent with the finding of the Board of Governors that his paranoia has not been cured. The psychiatrists who testified stated that it is very unlikely that the illness can be cured without extensive treatment, and it cannot be predicted when or how its symptoms will be manifested in the future.

As this court stated in the earlier opinion in this case, we are not concerned here with punishment of an individual who is suffering from a mental illness, but rather in protecting the public and the legal profession from the possible consequences of allowing a person handicapped by such an illness to practice law. I cannot believe that a doctor suffering with palsey would be allowed by the medical profession to practice surgery. By the same token a man afflicted with a mental or emotional disease which compels him to perform dishonest acts and warps his judgment, should not be allowed to practice law.

I would either vacate the order of admission or adopt the recommendation of the Board of Governors and order a suspension until such time as the respondent can produce satisfactory medical testimony that the disease has been treated and cured.

DONWORTH, OTT, and HALE, JJ., concur with ROSELLINI, C. J.