[No. 8313.   En Banc.   May 3, 1990.]

*In the Matter of the Disciplinary Proceeding
Against* DAVID FRANCIS JOHNSON, *an
Attorney at Law.*

*Leland G. Ripley* and *Maria S. Regimbal,* for Bar Association.

*Keane & Rasmussen, P.S.,* by *Daniel J. Keane,* for respondent lawyer.

SMITH, J.—Respondent David F. Johnson, an attorney admitted to the Washington bar, converted $21,051.16 of client trust funds for his personal use. This court on November 3, 1989, ordered Respondent Johnson to show cause why he should not be disbarred. We conclude that David F. Johnson violated specified Rules of Professional

Conduct and we rule that he is disbarred, there being insufficient evidence of "extraordinary mitigating circumstances" to justify a lesser sanction.

The facts in this case are not in dispute. David F. Johnson is a graduate of Gonzaga University Law School. He was admitted to the Washington bar on June 8, 1978. He has no prior disciplinary record. During all relevant times he was a sole practitioner in Spokane, Washington.

In a series of 21 transactions during the period May 18, 1987, through February 8, 1988, Respondent Johnson converted $21,051.16 of client trust funds[1] to his personal use. He also took calculated steps to conceal the conversions from his clients and other interested parties. He suffered from chronic alcoholism during that period.

In May of 1987, Ms. Laura Swisher entered into a Real Estate Purchase and Sale Agreement to acquire a residence from Howard and Peggy Clayman. Respondent Johnson was to act as closing agent for the transaction. Ms. Swisher gave respondent $2,000 earnest money, which he deposited in his client trust account.[2] Ms. Swisher financed $32,904 for the purchase through Shelter Mortgage Company of Spokane.

On July 15, 1987, Ms. Mary Blayden, Assistant Manager of Shelter Mortgage, met with Respondent Johnson to discuss the closing to be certain that the title was cleared so that Shelter could be in a first lien position in order to sell the loan in the secondary market. On July 24, 1987, Shelter

---

[1] The funds were derived from a real estate transaction for which Respondent Johnson was acting as closing agent. This opinion refers to the funds as "client trust funds." Respondent does not contest this characterization. See RPC 1.14(d), which provides:

"Escrow and other funds held by a lawyer incident to the closing of any real estate or personal property transaction are client funds subject to [RPC 1.14] regardless of whether the lawyer, the law firm, or the parties view the funds as belonging to clients or nonclients."

[2] Respondent maintained two client trust accounts. All transactions mentioned in this opinion involved "Trust Fund No. 2."

Mortgage tendered a check payable to the David F. Johnson Trust Account in the amount of $31,017.82, which Johnson deposited in his client trust account.

The Claymans held the property subject to a real estate contract with Warren and Honey Poppe (the "Clayman–Poppe contract").[3] Respondent Johnson had previously represented the Claymans in a real estate contract forfeiture action initiated by the Poppes. As of July 24, 1987, the balance due on the Clayman–Poppe contract was $21,026.76. Shelter Mortgage's funding authorization directed Respondent Johnson to pay the real estate contract in full.

Respondent Johnson made unauthorized withdrawals of $2,300[4] from the trust account until the scheduled closing date of July 27, 1987. He used the funds for personal purposes, including payment of office expenses for his law practice.

Respondent Johnson executed a number of documents involved in the transaction and disbursed a partial payment of $8,000 to the Claymans. A balance of $1,091.33 remains unpaid. Mr. Johnson did not pay the underlying real estate contract. When he contacted Ms. Honey Poppe by telephone inquiring about title to the property, he did not inform her of the sale.

The purchaser, Ms. Swisher, took early possession of the property. She believed the transaction had "closed" in July 1987. The Claymans also believed the sale had closed and ceased making payments on their real estate contract with the Poppes.

---

[3]This is the name by which the parties refer to this document. In addition, the underlying deed conveying the property from the Poppes to the Claymans is referred to by the parties as the "Poppe–Clayman" deed. Although these references are somewhat confusing, we nevertheless retain them in this opinion.

[4]These withdrawals presumably were debited against Ms. Swisher's $2,000 deposit. The record does not indicate whether the account was ever overdrawn.

In the fall of 1987, Ms. Honey Poppe contacted Respondent Johnson because the Claymans' payments were delinquent for 3 months. Respondent still did not advise Ms. Poppe that the property had been sold. Instead, he suggested that the Claymans were having financial difficulties, and assured her the arrearages would be paid.

About October 1, 1987, respondent from his trust account paid $579 on the Clayman–Poppe contract. For the next several months, through February 1988, he made monthly payments on the contract by checks drawn on that trust account. Meanwhile, in a series of 17 additional checks drawn on his trust account, Respondent Johnson withdrew $18,751.16 for his personal use between July 1987 and February 1988. Some of the funds were used in settlement of a foreclosure action involving his personal residence.

In February 1988, Ms. Mary Blayden called respondent to find out why the deed conveying the property from the Poppes to the Claymans (the "Poppe–Clayman" deed) had not been recorded. He replied that the deed was in the basement of his office, and that he would retrieve it and arrange for recording. At the time, the Poppes had executed the deed, but Mr. Johnson knew it was in possession of the Washington Trust Escrow Department, the escrow collection service used for the Clayman–Poppe contract. The contract remained unpaid.

On March 23, 1988, Gerald L. Bopp, an attorney representing Shelter Mortgage, wrote to respondent again requesting that the deed be recorded.

On March 25, 1988, Ms. Blayden contacted the Washington Trust Bank Escrow Department and discovered that the Clayman–Poppe contract had not been paid, that intermittent payments had been made on the contract after the "closing" in July of 1987, and that the unrecorded deed remained with the Escrow Department. That same day, Respondent Johnson wrote to Shelter Mortgage's attorney:

It appears that the reason the Poppe to Clayman deed has not been recorded is because the underlying contract has not

been paid off. Why this happened is not clear from looking at the file. We are taking immediate steps to do so and will walk the document through recording to expedite issuance of the title policy by Safeco.

In March or April of 1988, Ms. Honey Poppe visited the property covered by her contract with the Claymans and saw a commercial real estate sign in the yard. She introduced herself to the occupant, Ms. Swisher. Ms. Poppe learned that the property had been "sold" to Ms. Swisher. Ms. Swisher learned that the sale had not closed.

Shelter Mortgage, the Claymans and Ms. Swisher all sought legal counsel.

On May 2, 1988, the Washington State Bar Association sent Respondent Johnson a request for response to a complaint filed by Gerald L. Bopp alleging Johnson's failure to pay the Clayman–Poppe contract.

On May 4, 1988, by check drawn on his trust account, respondent paid $21,126.15 to clear the Clayman–Poppe contract. He deposited his personal funds in the trust account to cover this check.

The complaint filed by Gerald L. Bopp resulted in a disciplinary hearing for Respondent David F. Johnson on May 23, 1989. The Hearing Officer concluded that Respondent Johnson violated Rules for Lawyer Discipline 1.1(a) and (i) by violating the Rules of Professional Conduct and provisions of the criminal code, summarized as follows:

1. RPC 1.4 (attorney must keep client reasonably informed about the status of a matter and promptly comply with reasonable requests for information);

2. RCW 9A.56.020–.030 (theft in the first degree, "a felony involving moral turpitude");

3. RPC 8.4(b) (attorney prohibited from committing a criminal act adversely reflecting upon lawyer's honesty);

4. RPC 8.4(c) (lawyer prohibited from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation);

5. RPC 8.4(d) (attorney prohibited from engaging in conduct prejudicial to administration of justice); and,

6. RPC 1.14 (attorney prohibited from depositing or maintaining the attorney's funds in client trust account).

During the period from July 1986 through June 1988, Respondent Johnson suffered from chronic alcoholism. In June 1988, he entered a 21–day inpatient alcohol treatment program at Mountainview Hospital. He testified at the disciplinary hearing that he has been sober since June 1988. He attends Alcoholics Anonymous meetings regularly,. and since June 1988, has participated in the Washington Bar Association's Lawyers Assistance Program.

Charles R. Dorsey, M.D., a physician board certified in addiction medicine, testified that a chronic alcoholic's moral judgment may be affected by his disease. He further testified that it was his opinion that David F. Johnson had not consumed alcohol for approximately 6 months prior to the May 1989 disciplinary hearing. Dr. Dorsey also testified that Johnson's prognosis for remaining sober is "80%."

When Dr. Dorsey was asked whether, in his opinion, Mr. Johnson was able to distinguish right from wrong while suffering from chronic alcoholism, he replied:

> I think he could distinguish right from wrong. Whether his alcoholism would lead him to aberrant judgment as to what to do with that right and wrong is something else again. I think he knew very well probably at the time when he took the money, that that was probably wrong. There was something that said it's wrong, and this is my own opinion, I'm doing a lot of supposing. But in his alcoholic state, that was justified, because everything else was going to pot, and there was a need for money, so that seemed to be a perfectly rational, correct, reasonable thing to do.

He continued:

> [The alcoholic reasons that] [s]ure, taking the money was wrong, but what the heck? The money is there, and it's not doing anything, and you really need the money, and you're going to put it back. So I think this is the thought process.

Respondent Johnson himself admitted in testimony that he knew the funds he used were not his, but that his judgment was impaired by alcoholism and depression when he removed the client funds from his trust account.[5] He similarly admitted that he understood at the time he converted the funds that he was violating trust account provisions of the Rules of Professional Conduct.

The Hearing Officer found that respondent fully cooperated with the Bar Association's investigation and recommended a reprimand followed by probation for 2 years.

By an 11-to-1 vote, on September 19, 1989, the Disciplinary Board recommended suspension for 1 year followed by probation for 2 years. The dissenting member recommended disbarment, characterizing respondent's actions as "first degree theft while acting in a fiduciary relationship."

This court, by Order dated November 3, 1989, suspended David F. Johnson and ordered him to show cause why he should not be disbarred.

---

[5]The following colloquy occurred between Bar Counsel Maria S. Regimbal and Respondent Johnson:

Q. During this period of time, May of '87 through March of 1988, did you understand the funds you were removing were from that real estate closing and were not your own?

A. Yes, I guess I did.

Q. Did you understand that you were violating the trust account rules by removing those funds?

A. I think so, yes.

Respondent's counsel, Daniel J. Keane, questioned him on direct examination:

Q. At the time this took place between May of 1987 and June of 1988, did you know that this conduct [failing to close the real estate transaction] was improper?

A. Sure.

Q. Did you on the date, the first time you took some money out of your trust account, know that it was improper to do so?

A. I think so, sure.

Q. Do you have a reason or an answer as to why you did it, an explanation?

A. I have had about a year to reflect on it. The only explanation that makes any sense is that I was affected by alcohol. I think I was also depressed, whatever that means. [Balance of answer omitted.]

This disciplinary action presents the following question:
What is the appropriate disciplinary sanction for an attorney who, while suffering from chronic alcoholism, converts more than $21,000 of client funds for his personal use and actively conceals the conversion in a series of 21 transactions over a 9–month period?

██ We have previously approved the American Bar Association's *ABA Standards for Imposing Lawyer Sanctions* (Approved Draft, 1986).[6] In determining an appropriate disciplinary sanction, we apply the analytical framework provided by the *Standards*.[7] Neither the Hearing Officer nor the Disciplinary Board followed the framework provided by the ABA *Standards*. We necessarily must extract information from the limited record and perform the ABA analysis ourselves. To avoid this problem in the future, hearing officers and the Disciplinary Board will be required by this court in every case to indicate clearly in their findings (1) the formal complaint; (2) findings of fact; (3) conclusions indicating violations of specific provisions of the Rules of Professional Conduct; (4) the sanction suggested by the ABA *Standards*; (5) weighing of any aggravating or mitigating factors, based upon the ABA *Standards*, considered in determining what sanction to recommend; and, (6) the sanction recommended by the Hearing Officer or the Board.

Using the framework provided by the *Standards,* these questions are considered:[8]

1. What ethical duty did the lawyer violate?
2. What was the lawyer's mental state?
3. What was the extent of the actual or potential injury caused by the lawyer's misconduct?
4. Are there any aggravating or mitigating circumstances?

---

[6]*See, e.g., In re Rentel,* 107 Wn.2d 276, 283, 729 P.2d 615 (1986).

[7]*In re Rentel,* 107 Wn.2d 276, 283, 729 P.2d 615 (1986).

[8]*E.g., In re Simmons,* 110 Wn.2d 925, 931, 757 P.2d 519 (1988).

Respondent Johnson testified that he knew he was taking client funds and he knew it was a violation of the Rules of Professional Conduct when he did it. He concealed his acts by subterfuge and deceit. The injury and potential injury to the various parties caused by his actions were great. Thus, the following provisions of the *Standards* are applicable:

4.11 Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.

4.61 Disbarment is generally appropriate when a lawyer knowingly deceives a client with the intent to benefit the lawyer or another, and causes serious injury or potential serious injury to a client.

5.11 Disbarment is generally appropriate when: . . . (a) a lawyer engages in serious criminal conduct, a necessary element of which includes . . . misappropriation, or theft . . ..

*ABA Standards for Imposing Lawyer Sanctions* (Approved Draft, 1986).

We thus conclude at this point that disbarment is the appropriate sanction for Respondent Johnson's conduct.

We next consider whether there are any aggravating and mitigating circumstances which support a deviation from the presumptive sanction of disbarment.

The *Standards* include the following aggravating factors to be considered in assigning disciplinary sanctions, at Std. 9.2:

(a) prior disciplinary offenses;

(b) dishonest or selfish motive;

(c) a pattern of misconduct;

(d) multiple offenses;

(e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;

(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

(g) refusal to acknowledge wrongful nature of conduct;

(h) vulnerability of victim;

(i) substantial experience in the practice of law;

(j) indifference to making restitution.

Here it is apparent that respondent had a dishonest or selfish motive and that he had substantial experience in the

practice of law. His repeated invasion of client trust funds constituted a pattern of misconduct involving multiple offenses. In addition, respondent has not yet made full restitution to the Claymans.

The *Standards* also include the following mitigating factors to be considered in assigning disciplinary sanctions, at Std. 9.3:

(a) absence of a prior disciplinary record;
(b) absence of a dishonest or selfish motive;
(c) personal or emotional problems;
(d) timely good faith effort to make restitution or to rectify consequences of misconduct;
(e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings;
(f) inexperience in the practice of law;
(g) character or reputation;
(h) physical or mental disability or impairment;
(i) delay in disciplinary proceedings;
(j) interim rehabilitation;
(k) imposition of other penalties or sanctions;
(l) remorse;
(m) remoteness of prior offenses.

Here respondent has no prior disciplinary record. He has been rehabilitated and is recovering from his alcoholism. He has shown remorse. Arguably, respondent has made a good faith effort at restitution because he has paid off the Clayman–Poppe contract (although he has not yet paid the Claymans all of the proceeds of the transaction to which they are entitled). However, whether that payment was "timely," since it was not made until the disciplinary process was underway, and whether all the consequences of the misconduct have been rectified, remain unanswered questions.

■ Factor (e), cooperation with the disciplinary investigation, is not a particularly significant mitigating factor in determining an appropriate sanction. It is the duty of every attorney to cooperate with a bar investigation.[9] But failing or refusing to cooperate with a disciplinary investigation is

---

[9]*See* RLD 2.8(b)(3).

indeed an aggravating factor which may either increase the sanction applied or delay an attorney's eligibility for reinstatement.

When we balance the preceding aggravating and mitigating factors, we find no reason to deviate from the presumptive sanction of disbarment. Respondent Johnson, however, claims as further mitigation that he had personal financial problems (mitigating factor (c)) and that he was impaired by alcohol addiction (mitigating factor (h)).

▮ Personal financial problems, however severe, do not mitigate against a sanction of disbarment. In *In re Butler*, 110 Wn.2d 95, 98, 750 P.2d 641 (1988) (petition for reinstatement), the attorney had converted $10,300 for his personal use "because his minor child was in serious need of medical attention, and he did not believe he had any other means of providing for her needs." He was disbarred. Here, after the complaint was filed, respondent readily was able to borrow funds to replenish his trust account.

▮ Notwithstanding respondent's personal financial problems, disbarment would still be the appropriate sanction recommended under the *Standards*. This is in accord with the general rule in Washington: "[A] lawyer's failure to preserve the integrity of client funds leads to disbarment, absent extraordinary mitigating circumstances."[10] Here, it is undisputed that respondent failed to preserve the integrity of his clients' funds. Absent proof of "extraordinary mitigating circumstances," then, disbarment is the proper sanction.

▮ Respondent Johnson contends that his affliction with chronic alcoholism, which he claims affected his "moral judgment,"[11] is sufficient mitigation to reduce his

---

[10]*In re Rentel,* 107 Wn.2d 276, 286, 729 P.2d 615 (1986) (citing *In re Noble,* 100 Wn.2d 88, 92, 667 P.2d 608 (1983); *In re Moynihan,* 97 Wn.2d 237, 238, 643 P.2d 439 (1982)). *See also In re Deschane,* 84 Wn.2d 514, 527 P.2d 683 (1974); *In re Batali,* 85 Wn.2d 246, 533 P.2d 843 (1975).

[11]Brief of Respondent, at 19. Compare *In re Noble,* 100 Wn.2d 88, 91, 667 P.2d 608 (1983).

sanction from disbarment to suspension. This court has, "on occasion, held that alcoholism is a mitigating circumstance in misappropriation cases."[12] However, "alcoholism is only a *mitigating* factor, and will only be considered as such in certain circumstances; it does not *excuse* an attorney's misconduct."[13] It is not an *extraordinary* mitigating factor.

In *In re Rentel*, 107 Wn.2d 276, 287, 729 P.2d 615 (1986), this court quoted with approval the following language from the Illinois Supreme Court:

> Perhaps in rare cases alcoholism might so change the character of the misconduct or so distort the attorney's state of mind as to provide a complete excuse. Usually, however, alcoholism is at most an extenuating circumstance, a mitigating fact, not an excuse. The attorney's impaired judgment diminishes the responsibility [the attorney] must bear, but does not eliminate it. Not all alcoholics appropriate the money of their clients; the slide from drink to dishonor may be smooth, but it is neither automatic nor uncontrollable. We can understand it; we cannot excuse it or overlook misconduct as serious as respondent's. Alcoholics need not be treated just like other people; our duty to uphold the standards and reputation of the profession is not incompatible with sympathy and leniency for victims of alcoholism. But their tragedy cannot be used as a license to exploit clients by taking their money.[14]

---

[12]*In re Rentel*, 107 Wn.2d 276, 286–87, 729 P.2d 615 (1986) (citing *In re Noble*, 100 Wn.2d 88, 667 P.2d 608 (1983)). *See also In re Kumbera*, 91 Wn.2d 401, 588 P.2d 1167 (1979). Unlike Noble and Kumbera, Rentel was disbarred.

[13]*In re Rentel*, 107 Wn.2d 276, 287, 729 P.2d 615 (1986) (italics in original) (attorney disbarred for conversion of $26,000 while addicted to alcohol and cocaine).

[14]*In re Rentel*, 107 Wn.2d 276, 287, 729 P.2d 615 (1986) (quoting with approval *In re Driscoll*, 85 Ill. 2d 312, 316–17, 423 N.E.2d 873 (1981) (attorney suspended for 6 months)). The *Driscoll* opinion further stated:

> The respondent was impaired, but not paralyzed. He continued to function to some extent. He occasionally tried cases and negotiated settlements, including those he got into trouble over. At least at times, he must have been rational enough to appreciate his duty to his clients, and to be reminded that even if he did not care, others would. We cannot regard him as entirely an innocent victim of forces beyond his control. To some degree he was culpable.

While the Illinois court merely suspended James Francis Driscoll for 6 months, this court disbarred Gary W. Rentel.

This court has in only two cases declined to disbar an attorney who converted client funds while suffering from alcoholism. The first of these was *In re Kumbera,* 91 Wn.2d 401, 588 P.2d 1167 (1979); the other was *In re Noble,* 100 Wn.2d 88, 667 P.2d 608 (1983). However, in the more recent case of *In re Rentel,* 107 Wn.2d 276, 729 P.2d 615 (1986), this court disbarred a defalcating attorney who was impaired by combined addictions to alcohol and cocaine.

In *Kumbera,* with reference to some of the converted funds, the Board found, and the court attached significance to, "a definite lack of full understanding by the attorney and client as to the terms of the trust relationship" and noted that an informal relationship existed between the parties.[15] Here, no such informal relationship existed. There is no contention that respondent did not understand his relationship to the parties or his responsibility in handling their funds.

In *Noble,* the attorney claimed "that he was suffering from the disease of alcoholism, which had eroded his moral judgment."[16] William A. Noble had converted funds from his father's estate, for which he was executor. Like respondent in this case, Noble had successfully sought treatment for his alcoholism. Noble was suspended for 3 months.

■ However, in *Noble,* although the attorney converted $31,062.01, this court noted there was a "lack of a 'pattern' of misuse of funds which so often appears in this type of

---

And perhaps there are many like him; misbehaving attorneys suffer from alcoholism or comparable difficulties remarkably often in our stressful profession. If suspending the respondent will keep any of them from dishonesty or reassure the public that even hard–drinking attorneys must play fair, respondent has no legitimate complaint.

[15]*In re Kumbera,* 91 Wn.2d 401, 403, 588 P.2d 1167 (1979). *See In re Kumbera,* 91 Wn.2d 401, 406, 588 P.2d 1167 (1979) (Wright, C.J., dissenting) ("It seems to be some excuse that [Kumbera] only stole from friends.").

[16]*In re Noble,* 100 Wn.2d 88, 90, 667 P.2d 608 (1983).

disciplinary action."[17] Here, Johnson established a pattern by invading his trust fund at least 21 times.

Significantly, in neither *Kumbera* nor *Noble* is there a suggestion that the attorneys deceived clients or other affected parties or employed any subterfuge to conceal their conversion of client funds. Respondent Johnson did both. He either led his clients to reach false conclusions about the status of their real estate transactions or intentionally misled them concerning the status of the transaction. He withheld information from Ms. Poppe, made periodic payments on the Clayman–Poppe contract as if there had never been any sale to Ms. Swisher, and lied to representatives of Shelter Mortgage about the whereabouts and status of the Poppe–Clayman deed. This case less resembles *Noble* and *Kumbera* than it does the later case of *Rentel.*

In *Rentel,* the attorney converted $26,000 of client funds in a 10–month period while suffering from combined addictions to alcohol and cocaine. Gary W. Rentel was disbarred. Similar to testimony in this case, there was expert testimony that Gary W. Rentel "could distinguish between his money and his clients' money."[18] The court focused on Rentel's *knowledge* of his wrongdoing and disbarred him.

It is apparent that Respondent Johnson knew precisely what he was doing while he was doing it, and how to continue doing it without detection for as long as possible through deception and subterfuge. His misconduct is no more excusable than was the attorney's misconduct in *Rentel.*

■ The Disciplinary Board has recommended a sanction for Respondent Johnson of suspension for 1 year followed by probation for 2 years. This court gives "serious consideration to the recommendations of the Disciplinary Board" and "should not lightly depart from the recommendations shaped by [the Board's] experience and perspective"

[17]*In re Noble,* 100 Wn.2d 88, 92, 667 P.2d 608 (1983).

[18]*In re Rentel,* 107 Wn.2d 276, 280, 729 P.2d 615 (1986).

because it is the "only body in the state [of Washington] to consider the full spectrum of disciplinary matters".[19] However, "the ultimate responsibility for determining the nature of discipline rests with this court and not the Disciplinary Board."[20]

This court will adopt the Board's recommendation unless one or more of the following factors "clearly persuades [this court] that the sanction recommended by the Board is inappropriate:"[21]

1. The purposes of attorney discipline (sanction must protect the public and deter other attorneys from similar misconduct);

2. The proportionality of the sanction to the misconduct (sanction must not depart significantly from sanctions imposed in similar cases);

3. The effect of the sanction on the attorney (sanction must not be clearly excessive);

4. The record developed by the hearing panel (sanction must be fairly supported by the record and must not be based upon considerations not supported by the record); and,

5. The extent of agreement among the members of the Board (sanction supported by unanimous recommendation will not be rejected in the absence of clear reasons).

The factor weighing most heavily in this case is the proportionality of the sanction. As noted earlier, the usual sanction for conversion of client funds by a Washington attorney is disbarment. Although alcoholism was a mitigating factor in *Kumbera* and *Noble,* Washington has not recognized alcoholism as an "extraordinary mitigating factor." We rejected combined alcohol and drug addiction as extraordinary mitigation in *Rentel.* In no previous case

---

[19]*In re Noble,* 100 Wn.2d 88, 94, 667 P.2d 608 (1983).

[20]*In re Noble,* 100 Wn.2d 88, 95, 667 P.2d 608 (1983) (citing *In re Espedal,* 82 Wn.2d 834, 838, 514 P.2d 518 (1973)). *See* RLD 2.1.

[21]*See In re Noble,* 100 Wn.2d 88, 95–96, 667 P.2d 608 (1983).

where there has been a pattern of multiple invasions of client trust funds by an attorney for the attorney's personal benefit have we held that alcoholism is an extraordinary mitigating circumstance justifying a sanction less than disbarment. We reject alcoholism as extraordinary mitigation in this case.

Respondent Johnson knew he was converting client funds and actively concealed the conversion. His chronic alcoholism, which he claims affected his "moral judgment," is not the type of "extraordinary mitigating circumstance" which justifies mere suspension.

David F. Johnson is disbarred for conversion of client trust funds.

CALLOW, C.J., UTTER, BRACHTENBACH, DOLLIVER, DORE, ANDERSEN, and DURHAM, JJ., and DIXON, J. Pro Tem., concur.