[No. 1187.  En Banc.  February 18, 1993.]

*In the Matter of the Disciplinary Proceeding Against*
JOHN O. MCLENDON, *an Attorney at Law.*

*Hemovich, Nappi, Oreskovich & Butler,* by *Carl J. Oreskovich* and *Michael J. Hemovich,* for appellant.

*Robert D. Welden,* for Bar Association.

*Dustin Deissner* on behalf of the National Alliance for the Mentally Ill, amicus curiae for appellant.

DOLLIVER, J. — John O. McLendon has stipulated to very serious ethical violations including the conversion of client funds. Such conduct mandates disbarment in virtually every circumstance to ensure the protection of the public, the deterrence of lawyer misconduct, and the preservation of public confidence in the bar. In rare instances, however, an extraordinary circumstance may be presented where the purposes of lawyer discipline are not served by disbarment and a lesser sanction is warranted. This is such a case.

John McLendon has been a member of the Washington State Bar since 1969 and has practiced primarily in Spokane, Washington. In the early 1970's, McLendon began to notice mood swings, and in 1978 he consulted Brian N. Gipstein, M.D., a psychiatrist, about the problem. Dr. Gipstein saw McLendon six times between January and July 1978, diagnosed depression, and prescribed an antidepressant. Between 1982 and 1984, McLendon regularly visited a general practitioner, who again prescribed antidepressants, possibly including Elavil. In 1985, McLendon began seeing another psychiatrist, Timothy W. Keller, M.D., who also diagnosed depression and prescribed Elavil.

Between 1984 and 1987, McLendon's mood swings worsened. During these times, McLendon's friends characterized his behavior as wired, grandiose, and angry. At other times, McLendon is described as withdrawn, totally down, and suicidal. His behavior reflected his worsening condition. McLendon began expanding his law practice. He remodeled his current law office. He hired lawyers, doctors, nurses, and artists to work for him full time. He opened offices in Boise and Coeur d'Alene, Idaho, and planned to open another in Montana. He purchased property and tore down three existing homes to construct a new office complex which would include a courtroom, swimming pool, tennis court, racquetball court, and sauna. He purchased all-terrain-vehicle motorcycles, 12 horses, 8 mules, 10 tons of hay, 4 to 6 horse trailers, expensive trapshooting and archery equipment, and $5,000 to $6,000 worth of horseshoes.

In the context of this behavior, McLendon (1) borrowed money from his clients without adequate and proper documentation, (2) failed to comply with a 1985 stipulation to discipline ordering payment of restitution to a client, and (3) misappropriated client trust funds.

Between 1982 and 1986, McLendon is alleged to have borrowed improperly money from 11 clients totaling $1,127,853. The record is inadequate to determine the accuracy of this figure or the exact amount of loans which remain unpaid. For example, bar counsel moved to dismiss allegations based upon the bulk of these loans, $950,000, representing two loans from one client. Moreover, there is a dispute in the record as to whether this amount was repaid to or otherwise settled with the client. As to the remaining amount, the parties stipulated that all of the loans had been repaid except for two in the amounts of $10,000 and $34,000, which were partially repaid. The record, however, does not state what portion of the amounts remains unpaid.

In February 1985, pursuant to a stipulation to discipline, McLendon was ordered to pay restitution to the estate of Gladys Hokum in the amount of $29,000 plus disciplinary costs for "overreaching with respect to attorney fees due him from a personal injury action." Findings of fact, at 3. The last payment McLendon made was on July 28, 1986, leaving a balance owing of $19,342.03, plus costs and interest.

Between June 1986 and April 1987, McLendon misappropriated money from client trust accounts totaling $90,305.78. During this time, McLendon also filed a false trust account declaration certifying his compliance with rule 1.14 of the Rules of Professional Conduct.

Finally in April 1987, McLendon's behavior worsened to the point where he was involuntarily admitted to Pine Crest Psychiatric Hospital in Coeur d'Alene, Idaho, for 43 days. The hospital psychiatrist, Joe Leggett, M.D., initially diagnosed McLendon as having a major depression, but, after more extended observation, recognized McLendon was suffering from bipolar disorder.

Bipolar disorder is recognized by the American Psychiatric Association, is listed in the American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (3d rev. ed. 1987) (DSM-III-R), and has specific diagnostic criteria. The disorder is biochemical in nature and involves abnormal levels of neurotransmitters in the brain which involuntarily trigger cycling between the manic and depressive phases of the illness.

The symptoms of the manic phase are increased activity manifested by increased spending, increased physical activity, agitation, irritability and hostility. Dr. Leggett testified the increased activity is accompanied by feelings of elation, grandiosity, exaggerated self-esteem, and impaired judgment.

> Anything they do ordinarily would be increased to the point where it goes beyond judgment.
>
> . . . .
>
> . . . Frequently in a manic state the person has ideas of grandiosity such as wanting to develop [an] unrealistic lifestyle, wanting to purchase a number of buildings or something that is totally unrelated to their usual activities. . . .

Transcript, at 147-48. The DSM-III-R states the most common complications from which persons in the manic phase suffer include "consequences of actions resulting from impaired judgment, such as financial losses and *illegal activities*." (Italics ours.) DSM-III-R, at 216.

Dr. Leggett testified that judgment is also impaired in the depressive phase. The symptoms of the depressive phase are social withdrawal; indecision even in mundane matters, such as attire; a lack of confidence; inability to concentrate and think well; and feeling sad, tearful, and suicidal.

The psychiatric testimony of Drs. Leggett and Gipstein regarding the severe extent to which judgment is impaired in both phases of bipolar disorder is uncontroverted. Neither the qualifications nor credibility of these professionals are challenged. Dr. Leggett testified:

> Q: My original question, I am trying to figure out if we have a person suffering from a bipolar disorder that would be in a manic stage, how would that affect their mental state, *their ability to form an intent or the ability to know that they acted and be aware of the consequences?*

A: *It would be severely impaired.*
Q: *Would the same hold true for depression?*
A: *Yes.*

(Italics ours.) Transcript, at 151. At deposition, Dr. Gipstein testified:

Q: Doctor, one of the, I think, the symptoms that you discussed in terms of being present during a bipolar disorder, particularly the upside, the manic or hypomanic side, is the symptom of impaired judgment, is that accurate?
A: Absolutely.
Q: What do you mean by that please?
A: Well, a person makes decisions that rational people around would say are foolish, foolhardy. *A person does not recognize the consequences of those decisions or denies them. . . . They don't have the capacity to balance their thinking and their actions.*
Q: *Why is that? Is that something that's intentional?* I just don't want to hear it, or something that occurs as a result of the biological change . . .?
A: *It's a biological change. I don't think there is any question about that. This is a biochemical, physiologic problem. . . .*

(Italics ours.) Deposition of Brian N. Gipstein, M.D., at 25-26. Also uncontroverted is Dr. Leggett's testimony that McLendon suffered from an "extreme" case of bipolar disorder. Transcript, at 190.

Dr. Leggett testified McLendon suffered from bipolar disorder many years before he was hospitalized in 1987, and it was "likely" the disorder became more severe in the 2 years prior to his hospitalization due to McLendon's earlier treatment with Elavil. Transcript, at 175, 181. While Elavil is not totally contraindicated for treating bipolar disorder, its use risks increasing the cycling between the phases and aggravating the manic phase. Dr. Keller testified, by affidavit, that during the time he treated McLendon, between June 1985 and April 1987, McLendon was "more probabl[y] than not" suffering from bipolar disorder rather than depression when he prescribed Elavil.

Since McLendon was accurately diagnosed and treated with lithium carbonate, he has not had any symptoms of mania and his depressive symptoms have been alleviated by antidepressant medications. This response corresponds with

the documented success of lithium therapy in the treatment of bipolar disorder. *See, e.g.*, R. Post, *Non-Lithium Treatment for Bipolar Disorder*, J. Clinical Psychiatry 9-16 (51 Supp. 1990); J. Rosenbaum, *The Course and Treatment of Manic-Depressive Illness: An Update*, J. Clinical Psychiatry 3 (49 Supp. 1988). Lithium intake, however, must be monitored by blood sampling because too low a dose is ineffective and too high a dose can be toxic.

In June 1987, following McLendon's release from the hospital, he voluntarily withdrew from the practice of law, transferred to inactive status, and has not practiced since that time. In addition, McLendon sold his belongings to pay restitution to his former clients. The fees he later received from cases he had worked on prior to his hospitalization were seized by the Internal Revenue Service and the bank holding the mortgage on his office building. Due to his voluntary withdrawal and then suspension from the practice of law, McLendon's income since his hospitalization has been limited to the minimal amounts received from odd jobs.

In February 1990, McLendon pleaded guilty to first degree theft based upon the conversion of client funds. McLendon stated he pleaded guilty even though his attorneys believed he had a good defense because he did not want to force his former clients to testify or bring further discredit to the bar. In his plea statement, McLendon stated,

> I accept full responsibility for my acts however I must state that during the episode the time in which these events took place I was given the wrong medication for acute depression which rendered me incapable of proper rationalization. I took unauthorized control over my clients funds.

McLendon was sentenced to 90 days in jail on work release, ordered to pay restitution, and is on probation for 10 years.

As a result of the misconduct, the bar association filed a formal complaint charging McLendon with 11 counts of misconduct. McLendon was suspended from the practice of law on February 27, 1990, pending the resolution of these disciplinary proceedings. On October 8 and 9, 1990, and December 12, 1990, a hearing was held pursuant to rule 4.10 of the

Rules for Lawyer Discipline. McLendon stipulated to the following ethical violations:

1. RLD 1.1(a) Commission of acts involving moral turpitude, etc.
2. RLD 1.1(i) Violation of the former code of professional responsibility.
3. RLD 1.1(m) Failure to meet conditions of a stipulation.
4. RLD 1.1(n) Failure to make restitution.
5. RPC 8.4(b) Conduct constituting a criminal act.
6. RPC 8.4(c) An act involving dishonesty, etc.
7. RPC 1.8(a) Entering into business transactions between lawyer and client.
8. RPC 1.14(a) Failure to maintain client funds in a trust account.
9. RPC 1.14(c) Failure to maintain complete records of all client funds in his possession.
10. RPC 1.14(b)(4) Failure to pay client funds when requested.
11. RCW 9A.56.030 Theft first degree.

Findings of fact, at 2.

The hearing panel officer made an unchallenged finding of fact that McLendon suffered from bipolar disorder "[a]t all times material[ly]" relevant to his misconduct, but concluded there was no "causal connection" between the illness and the misconduct. Findings of fact, at 3-4. The hearing panel officer recommended disbarment with the right to petition for reinstatement in 3 years from October 8, 1990, with credit for the 2 years McLendon spent on voluntary inactive status, upon compliance with certain conditions, including restitution and continued lithium therapy. Findings of fact, at 5-6.

McLendon appealed to the Disciplinary Board. The Board, by an 11-to-1 vote changed the findings to read

"Although there is evidence that Mr. McLendon's behavior was a manifestation of the manic episode of his illness, the record does not support the proposition that he was not aware of what he was doing."

Order, at 1-2. It also added the following conclusion of law:

"Respondent's illness does not constitute a sufficient extraordinary mitigating circumstance to justify a lesser sanction than disbarment."

Order, at 2. The Board held in a 10-to-2 decision that McLendon should be disbarred with no conditions or qualifications. The two dissenting board members would have suspended McLendon and conditioned his reinstatement on the conditions set forth by the hearing panel officer. McLendon appealed arguing (1) the Board erred in finding he acted "knowingly"; (2) the Board erred in recommending disbarment; and (3) alternatively, upon his disbarment, he should receive credit toward the 5-year waiting period for reinstatement based on the time he spent on voluntary inactive status.

■■ This court is the ultimate authority on lawyer discipline. *In re Hankin*, 116 Wn.2d 293, 295, 804 P.2d 30 (1991). The Board's recommendation will be adopted, however, unless (1) we can articulate a specific reason to depart from the recommendation, and (2) we are clearly persuaded the sanction is inappropriate under one or more factors set forth in *In re Noble*, 100 Wn.2d 88, 667 P.2d 608 (1983). *See In re Allotta*, 109 Wn.2d 787, 793, 748 P.2d 628 (1988); *Hankin*, 116 Wn.2d at 295-96. We may reject a nonunanimous recommendation more readily than a unanimous decision. *Noble*, 100 Wn.2d at 96.

■ In fulfilling our function, we have adopted the framework provided in the American Bar Ass'n, *Standards for Imposing Lawyer Sanctions* (1986) (ABA *Standards*). *In re Johnson*, 114 Wn.2d 737, 745, 790 P.2d 1227 (1990). Under this framework, the presumptive sanction is determined on a case-by-case basis through consideration of (1) the ethical duties violated, (2) the lawyer's mental state, and (3) the extent of the actual or potential injury caused by the lawyer's misconduct. *Johnson*, 114 Wn.2d at 745. We also consider the purposes and nature of lawyer discipline. *Hankin*, 116 Wn.2d at 297-98.

In this case, McLendon has stipulated to the ethical violations and acknowledges the misconduct is severe. The actual injuries caused by these violations are evident. Consequently, our focus is on McLendon's bipolar disorder and

its effect on his mental state and on the appropriate sanction. This is the first opportunity we have had to apply the ABA *Standards* to a lawyer who suffered from an organically based mental illness, bipolar disorder, during the time he improperly borrowed and converted client funds.

■ McLendon first argues his presumptive sanction should be suspension rather than disbarment because the record does not establish that he "knowingly" converted client funds. ABA *Standards*, Stds. 4.11, 4.12. In order to act with "knowledge" one must have "the conscious awareness of the nature or attendant circumstances of the conduct . . .". ABA *Standards*, at 17. The only testimony in the record regarding McLendon's mental state was the opinions of Drs. Leggett and Gipstein. Dr. Gipstein testified the "biochemical, physiologic" nature of bipolar disorder removes the "capacity to balance . . . thinking and . . . actions." Deposition of Brian N. Gipstein, M.D., at 25-26. Dr. Leggett testified the ability of a person with bipolar disorder to "know that they acted and be aware of the consequences" would be "severely impaired" in both the manic and depressive phases of the illness. Transcript, at 151. Dr. Leggett further testified McLendon suffered from an "extreme" case of bipolar disorder and stated, "It is my opinion that Mr. McLendon's behavior was a manifestation of the manic episode . . .". Transcript, at 190, 186. Consideration of this uncontroverted testimony, alone, would be persuasive evidence that McLendon did not act knowingly. We must, however, also consider McLendon's plea of guilty to first degree theft, a specific intent crime.

RLD 4.9 provides that a "conviction shall be conclusive evidence at the ensuing disciplinary hearing of the guilt of the respondent". Under the rules, a conviction can occur "upon entry of a plea of guilty . . .". RLD 3.1(b). McLendon's plea, however, was an *Alford*-type plea because, while pleading guilty, he protested he did not act intentionally because he was "incapable of proper rationalization." *See North Carolina v. Alford*, 400 U.S. 25, 37, 27 L. Ed. 2d 162, 91 S. Ct. 160 (1970). Generally, due process prohibits an *Alford* plea from being the basis for collateral estoppel in a subsequent action.

*See New York Underwriters Ins. Co. v. Doty,* 58 Wn. App. 546, 550-51, 794 P.2d 521 (1990). Washington has not addressed the issue whether due process requires a lawyer be given the opportunity in a subsequent disciplinary hearing to present the circumstances surrounding the entry of an *Alford* plea in mitigation of the penalty. The one jurisdiction addressing the issue held due process requires consideration of such mitigating evidence. *See Florida Bar v. Cohen,* 583 So. 2d 313, 314 (Fla. 1991) (citing *Florida Bar v. Pavlick,* 504 So. 2d 1231 (Fla. 1987)).

> [A]lthough a judgment of guilt entered upon an *Alford* plea is conclusive proof of guilt of the criminal offense charged, an attorney has a due process right to offer in mitigation an explanation of the circumstances surrounding such a plea.

(Footnote omitted.) *Cohen,* 583 So. 2d at 314 (citing Fla. Stat. Ann. Bar Rule 3-7.2(b) and (i)(2) of the Rules Regulating the Florida Bar, which state that a judgment of guilt shall be conclusive proof of guilt of the criminal offense(s) charged for the purposes of their disciplinary rules).

■ We need not address the effect of the plea on whether McLendon acted "knowingly", however, because we conclude the facts of this case establish an "extraordinary mitigating circumstance' " warranting a sanction less than disbarment. *See Johnson,* 114 Wn.2d at 748 (quoting *In re Rentel,* 107 Wn.2d 276, 286, 729 P.2d 615 (1986)).

Previously, this court has held that alcoholism and drug addiction are not extraordinary mitigating circumstances warranting a sanction less than disbarment for conversion of client funds. *See Johnson,* 114 Wn.2d at 752; *Rentel,* 107 Wn.2d at 287; *In re Noble, supra; In re Kumbera,* 91 Wn.2d 401, 588 P.2d 1167 (1979).

■■ In *Rentel,* we explain the rationale for this position.

> Respondent's use of alcohol was not illegal and began in a social manner. His use of cocaine, while illegal in nature, at least in the beginning was likewise of a casual and experimental nature. At some point in time, however, while still functioning in a relatively normal manner, he abandoned his volition, his freedom of choice and indeed, his responsibility. *Thus at some point in time, while the choice was still his,*

*respondent chose the path which ultimately led to his cocaine addiction. . . .*

(Italics ours.) *Rentel*, 107 Wn.2d at 288. In this case, there is uncontroverted psychiatric testimony that McLendon suffered from an extreme case of an organic brain disease which involuntarily, through a biochemical process, altered his judgment and behavior to the extent that his ability to know he acted was severely impaired.

Given the involuntary, biochemical nature of McLendon's illness, there is no time when McLendon chose the path which ultimately led to his misconduct. In fact, prior to the onset of the disorder, McLendon had an excellent reputation and was a capable and well prepared lawyer.

In *Johnson*, we also stated that alcoholism was not an extraordinary mitigating circumstance because its effect on the lawyer's judgment was intermittent.

> The respondent was impaired, but not paralyzed. He continued to function to some extent. He occasionally tried cases and negotiated settlements, including those he got into trouble over. At least at times, he must have been rational enough to appreciate his duty to his clients, and to be reminded that even if he did not care, others would. We cannot regard him as entirely an innocent victim of forces beyond his control. To some degree he was culpable.

*Johnson*, 114 Wn.2d at 749 n.14 (quoting *In re Driscoll*, 85 Ill. 2d 312, 316, 423 N.E.2d 873 (1981)). Bipolar disorder does not render a person incapable of functioning. Rather, the uncontroverted psychiatric testimony establishes that bipolar disorder severely impairs judgment in both the manic and the depressive phases to the extent that persons suffering from the disorder are unaware of their actions. The record reflects that, while McLendon could act or function, his mental state and his judgment as to his actions, in all aspects of his life, were beyond his control in both phases of the illness. Specifically, Dr. Leggett testified that a person suffering from bipolar disorder will, depending upon access to sources, such as client funds, use these funds even though a person without the disorder would recognize the illegality of the action. McLendon's misconduct occurred in the con-

text, and was, as the DSM-III-R states, a "complication" of his bipolar disorder. McLendon was the victim of a force beyond his rational control. This conclusion is supported by the alleviation of McLendon's symptoms following accurate diagnosis and proper treatment. Dr. Leggett testified that with continued lithium treatment, the possibility of recurrence was "very remote". Transcript, at 187.

The existence of bipolar disorder, the abatement of symptoms and misconduct following proper diagnosis and treatment, and a favorable prognosis distinguish this case from the three post-ABA *Standards* cases involving conversion of client funds which resulted in disbarment. *See In re Johnson, supra; In re Rentel, supra; In re McGough,* 115 Wn.2d 1, 13, 793 P.2d 430 (1990).

This case is also distinguishable from the pre-ABA *Standards* case wherein we disbarred an attorney for conversion of client funds who was alleged to suffer from manic depression. *See In re Moody,* 69 Wn.2d 808, 420 P.2d 374 (1966). That case contains no evidence as to whether Moody actually suffered from the illness; nor whether his misconduct resulted from this condition. Rather, the unchallenged findings stated Moody "was addicted to the use of alcohol . . .". *Moody,* 69 Wn.2d at 811.

We reject the argument by amicus curiae that mental illness should be a complete defense based upon *In re Sherman,* 58 Wn.2d 1, 9-10, 354 P.2d 888, 363 P.2d 390 (1961), *aff'd,* 66 Wn.2d 718, 404 P.2d 978 (1965). Both the ABA framework and the general rule in Washington which allows a lesser sanction in extraordinary mitigating circumstances require accountability for misconduct: The lawyer's mental state is relevant only in determining the appropriate sanction for such misconduct. *See* ABA *Standards,* Stds. 3.0(b), 9.32(h).

We hold that a lawyer who shows (1) the existence of bipolar disorder during all relevant times the misconduct was occurring, and (2) the abatement of symptoms and misconduct following proper diagnosis and treatment, establishes an extraordinary mitigating circumstance warranting a sanction less than disbarment.

We depart from the recommendation of the Disciplinary Board because we believe it treated McLendon exactly as if he never suffered from bipolar disorder and because we are fairly persuaded the sanction of disbarment is not fairly supported by the record. *See Noble*, 100 Wn.2d at 96.

■ We are also persuaded the purposes of lawyer discipline, to protect the public, deter misconduct of other attorneys, and protect public confidence in our bar, are not served by disbarment under this circumstance. *See Noble*, 100 Wn.2d at 95. McLendon has shown no symptoms of mania since being properly diagnosed and treated with lithium and his depressive symptoms have been alleviated with antidepressants. Dr. Leggett testified that a recurrence was "very remote". Further, the involuntary and biochemical nature of the disorder will deter the possibility that other attorneys, not so suffering, would believe they would be similarly treated. The public's education regarding the successful alleviation of the symptoms of bipolar disorder will maintain the public's confidence in our bar. We do not believe the lesser sanction we impose today, even considering the large amounts at issue, will detract from the public's confidence in our bar because of the involuntary nature of bipolar disorder and McLendon's successful treatment and optimistic prognosis.

■ The fact that McLendon is on probation until he completes the court-ordered restitution does not alter our opinion. *See In re McGrath*, 98 Wn.2d 337, 345, 655 P.2d 232 (1982) (pre-ABA *Standards* case stating it offended dignity of bar for lawyer on felony probation for second degree assault to practice law). We do not find *McGrath* persuasive in this instance. First, the ABA *Standards* regard the imposition of other penalties as a mitigating factor in determining the appropriate sanction, not an aggravating factor. ABA *Standards*, Std. 9.32(k). Second, McLendon's misconduct, including the conduct leading to his conviction, occurred entirely during the time he suffered from the symptoms of bipolar disorder. We do not believe it offends the dignity of the judiciary or the reputation of the bar for persons who have

suffered from a mental illness and been successfully treated to thereafter practice law in this state.

The result we reach today reflects the growing recognition and acceptance of the effects of mental illness in our bar and in our society. " 'Mental illness is an illness, not a character flaw.' " St. Peter Hospital, *Stigma Hurts: Shattering Stereotypes About Mental Illness*, 11 Vital Signs 7 (No. 3, Summer 1992).

We suspend McLendon for 2 years, with credit from the date of his suspension on February 27, 1990, upon the following conditions:

1. That he continue psychiatric counseling as recommended by his psychiatrist;
2. That he continue taking lithium or such other medications as prescribed for treatment of his bipolar disorder;
3. That he submit to proper blood sampling;
4. That all sums taken from his clients and all prior restitution be repaid or proper arrangements for repayment be provided; and
5. That he complete payment of all costs imposed against him in February 1985 and all costs of these disciplinary proceedings.

We are unable to determine the exact amount of restitution owed in this case because of the inadequate record. Bar counsel is admonished to ensure the express requirements set forth in *In re Johnson*, 114 Wn.2d 737, 745, 790 P.2d 1227 (1990) are followed in the future. In this case, the bar association is ordered to determine the exact amounts owed to McLendon's former clients. We do not, however, further condition McLendon's resumption of practice upon the bar's determination of the amount of restitution owed. When McLendon completes payment of the costs imposed against him (condition 5), he may resume the practice of law provided he is in compliance with the first three conditions. Repayment or arrangements for repayment of restitution (condition 4) shall be made immediately following the bar's determination of the amounts owed. The bar association

shall set reasonable terms for monitoring McLendon's compliance with the above conditions in consultation with McLendon and his psychiatrist. The bar association may treat a violation of these conditions as grounds for discipline in addition to those provided in RLD 1.1.

John O. McLendon is hereby suspended on the terms and conditions set forth in this opinion.

UTTER, SMITH, and JOHNSON, JJ., concur.

BRACHTENBACH, J. (dissenting) — I agree with the majority that a bipolar disorder may be an extraordinary mitigating circumstance to be considered when the record supports it as an excuse or explanation. This record does not support that conclusion.

The hearing officer recommended disbarment based upon the following finding of fact:

> Despite his illness there is no causal connection between it and the impropriety of his conduct in borrowing money from his clients and wrongfully appropriating his client's money from his trust account for his own use. Despite the illness, the respondent was fully aware of what he was doing.

Finding of fact 7.

Thus the hearing officer did not agree with the conclusions drawn by the majority from the same record.

Eleven members of the Disciplinary Board do not agree with the majority. They changed the above finding of the hearing officer to the following:

> Although there is evidence that Mr. McLendon's behavior was a manifestation of the manic episode of his illness, the record does not support the proposition that he was not aware of what he was doing.

Order of the Disciplinary Board, at 1-2.

Ten members of the Disciplinary Board do not agree with the majority because they found disbarment to be appropriate. Of the 13 persons who have reviewed this matter, only 2 agree with the majority. A thorough review of the record reveals why.

The essential question is whether the testimony and documents demonstrate that McLendon's felony conviction for theft from his clients, his conversion of $90,305.78 clients' trust funds and his improper loans of $1,127,859 are all explained and excused by his bipolar disorder.

A careful analysis of the record supports fully the findings of the hearing officer and the Disciplinary Board. The improper loans from clients began in May *1982*. They continued until December *1986*. McLendon stole trust funds from six clients, including two minors, from June 1986 to April 1987. In *1985* McLendon stipulated to ethical violations, and agreed to make restitution; he still owes more than $37,000.

The majority finds that these repeated egregious acts of misconduct, *over a period of 5 years*, can all be excused by his bipolar disorder.

Therefore, the medical testimony must be examined. The majority quotes Dr. Gipstein. Majority, at 766. Dr. Gipstein saw McLendon six times in *1978*, 8 years before the trust account violations and almost 4 years before the improper loans. His diagnosis was severe depression. He found *no symptoms of mania*. Specifically, he said: "So you couldn't say from what I have given you there that he had a bipolar illness." Deposition of Gipstein, at 14, 41. Bearing in mind that Dr. Gipstein did not diagnose bipolar *any* time he saw McLendon, his generalized statements about the disorder are of little help. He did, however, explain impaired judgment, upon which the majority builds its whole case. He said: "Well, a person makes decisions that rational people around would say are foolish, foolhardy. A person does not recognize the consequences of those decisions or denies them." Deposition of Gipstein, at 25.

There was no medical testimony concerning the period from *1978 to 1985*. In June 1985 McLendon consulted a psychiatrist, Dr. Keller, whose care extended to April 1987. This covers the period when all the trust account violations occurred and when two of the improper loans were made. It is critical to note that at this highly important stage, Dr.

Keller *did not diagnose a bipolar disorder.* The 1985 diagnosis was "suffering from an acute adjustment disorder with depressive features." Exhibit 22. Dr. Keller was not seen for more than a year, when the diagnosis was changed to major depression with obsessional personality pattern. Exhibit 22. Only when these proceedings were underway did Dr. Keller, and based upon information from the then attending psychiatrist, *retroactively,* express a belief that McLendon was suffering from a bipolar disorder. Reliance upon Dr. Keller's testimony for this crucial time period is highly suspect because his testimony came only in a 1½-page affidavit, admitted without objection.

The majority relies upon the testimony of Dr. Leggett, a psychiatrist, who saw McLendon only after all the defalcations had occurred. A close examination of his several relevant answers shows that his generalizations do not support the conclusions drawn by the majority. He testified:

Q: Doctor, a person with a bipolar disorder that's in the manic stage, so is their judgment impaired? For instance, does the manic state have anything to do with their ability to form an intent, does it have anything to do with their ability to know what they are doing, be aware of what they are doing?

A: Many times a person in a manic state has no indication what they're doing is beyond the scope of reasonable behavior. They have very poor insight. They don't understand what is going on with their illness, and they see their behavior as being very normal when everyone else can see it as being very abnormal. I am not sure I answered your question. I forgot your original question.

Q: My original question, I am trying to figure out if we have a person suffering from a bipolar disorder that would be in a manic stage, how that would affect their mental state, their ability to form an intent or the ability to know that they acted and be aware of the consequences?

A: It would be severely impaired.

Transcript, at 150-51.

THE HEARING OFFICER: Just explain briefly how a person who suffers from manic depressive disorder, because he has that disorder, would mishandle his client's funds.

THE WITNESS: All I can tell you, Your Honor, I have seen a lot of cases of bipolar disorders, and people who have very poorly managed funds. I have a recollection of a farmer I saw who

was 60 years old who sold all his cattle, was building an empire, very stable person ordinarily but went into a manic episode and was into hock to a quarter of a million dollars. After he was treated, he was in disbelief of that, also, couldn't do that. A person who is manic, they show very poor judgment. They make decisions real quickly based upon grandiose ideations. Everything seems to make sense to them, but they are totally out of touch with reality during manic episodes.

Transcript, at 194-95.

THE HEARING OFFICER: But a person who is in a depressive state does not mishandle his client's money.

THE WITNESS: A person in a depressive state usually is very lethargic and is more indecisive, and they may make decisions or not make decisions, not do anything, so a lot of their problems they have in the depressive phase is maybe omission. They don't do certain things. They neglect certain things. They don't show up for certain things. They do sloppy work. They do incomplete work. They procrastinate. They avoid. This is what, in my experience, most of the problems that a bipolar depressed has experienced. So therefore, they make poor decisions, but it's in a different sort of way.

Transcript, at 196-97.

Q: What Mr. McLendon did was to steal thousands of dollars from minor children, to steal money from the estates that was to be for the benefit of children, to steal money from his clients after having been a lawyer for 20 to 30 years. I didn't quite hear in your descriptions of these farmers or these fellows something quite on that level.

MR. ORESKOVICH: I am going to object to the form of the question.

THE HEARING OFFICER: Overruled.

A: I think that these people who I described, if they had access to anything, they would have done the same thing. I don't think Mr. McLendon's behavior in the manic state was unlike many other people I have seen in the manic state. I know this is hard to reconcile with a person themselves in terms of why would a person do this and why do you blame it on mental disorder, but I can tell you it happens. It happens a lot of times.

I have had, like I say, a person who has bought something and sold it to someone else, and that is fraud, and that's antisocial activities, and it's against the law. And many times the legal system brings them into me [sic] to begin with because they do commit crimes, they do commit things that are fraudulent that are theft, they take things and sell them and say, I will be able to pay it back because

> I will make millions of dollars over here, so they kind of rationalize over here how they are going to do these things. It happens.
>
> If a person has access to these things, of course, they are more likely to be able to use these things. They will spend their own money until it runs out, and they will get investors, try to talk banks into things, try to talk other people into things. They will sell things that don't belong to them because they will always say, I am going to be able to pay them back with lots of money and more because I am going to make millions on these ventures.
>
> So their thinking is that what they are doing is not illegal because they are going to be able to make millions off of them and be able to pay it back and be able to service these people. So they are rationalizing all the time they are doing it in a very grandiose sort of way, is what they are doing.

Transcript, at 197-99.

Thus, there is a fundamental and glaring omission from the testimony. No one ever testified that McLendon did not recognize that his conduct violated, clearly and repeatedly, the most basic ethical standards of lawyer conduct. Even the most favorable testimony from the most favorable witness, Dr. Leggett, skirts this critical point. His catchall phrase, emphasized by the majority, is "severely impaired". But bear in mind what he was asked: "[H]ow would that effect [*sic*] their mental state, their ability to form an intent or the ability to know that they acted and be aware of the consequences?" Transcript, at 150-51. This vague exchange does not answer the critical question whether McLendon knew he should not steal clients' money or borrow in clear violation of the rules. Leggett expanded his answers with references to "very poorly managed funds", "they show very poor judgment", "[s]o they are rationalizing all the time they are doing it in a very grandiose way, is what they are doing." Transcript, at 197-98. An explanation, yes; an excuse, no.

More important, perhaps, than a minute analysis of the medical testimony are the facts never mentioned by the majority. From 1982 to January 1986, McLendon took the responsibility for all major personal injury cases in his office. Transcript, at 251-54. In addition, he engaged in numerous transactions apart from his law practice. Perhaps there were

foolhardy, even bizarre transactions during this time, but he sought out and engaged in those transactions. There is no hint or claim of incompetency regarding those ventures. There is no hint or claim that his judgment was so impaired that any of his business transactions, outside the practice of law, were tainted with fraud or theft.

The McLendon files evidence his participation in all the loan activities. Most of the disbursement checks are signed by him. Those promissory notes which were in evidence were signed by him. What is more, McLendon admits these improper borrowings and had an independent recollection of all the loan transactions, except one. Transcript, at 272-74. He gave no explanation or excuse for these highly improper borrowings from clients to the tune of $1,127,859.

The real issue here is what should be the sanction for these admittedly serious, repetitive violations of the most basic standards of lawyer conduct. American Bar Ass'n, *Standards for Imposing Lawyer Sanctions*, Std. 9.22 (1986) lists 10 aggravating factors. It is not surprising that these 17 separate incidents, over nearly 5 years, with 11 counts and the violation of 10 separate rules result in the existence of 7 of the 10 possible aggravating factors. Adding the felony conviction results in a most distressing pattern of abuse of trust.

In summary, I find it difficult to believe that McLendon could practice law, try and settle major cases, and otherwise function as he did over a period of years, but become impaired beyond responsibility only when dealing with clients' funds. His plea to first degree theft should not be minimized as does the majority. The crime charged involves *intent*. RCW 9A.56.020(1)(a). He does not deny *intent* to steal. He said: "I accept full responsibility . . . [but] *wrong medication for acute depression . . . rendered me incapable of proper rationalization*. I took unauthorized control over my clients [*sic*] funds." (Italics mine.) That is hardly an equivocal plea.

Finally, McLendon is on probation as a felon for 10 years. In *In re McGrath*, 98 Wn.2d 337, 345, 655 P.2d 232 (1982), we said: "[W]e find it repugnant to the basic standards of

our legal profession to allow one who is serving a 10-year probation sentence for a felony conviction, for an act involving moral turpitude, to practice law and to represent clients in the courts of this state." The majority dismisses McGrath as not "persuasive". Majority, at 774. It should admit that it is overruling *McGrath* since it does do so.

I would uphold the decision of the hearing officer and uphold the considered judgment of 10 of the 12 members of the Disciplinary Board, and disbar. On February 27, 1990, we summarily suspended McLendon because of his felony conviction. With credit for that time, he could petition for reinstatement in early 1995. RLD 9.1(a). At that time, the bar and this court would know the exact status of his restitution and payment of costs and expenses. RLD 9.1(b). This is much more definitive and proper than the majority's nebulous direction that "proper arrangements for repayment be provided". Majority, at 775. Given the fact that he *stipulated* to restitution in *1985*, and only made one payment in 1986, it appears highly desirable that we wait until 1995 to learn what he has done about the $90,305.78 that he stole from clients, and learn about the status of claims of $131,206.99 against the client security fund, as well as unpaid loans from clients.

ANDERSEN, C.J., and DURHAM, J., concur with BRACHTENBACH, J.