**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE AUG 1 7 2017
CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on August 17, 2017

SUSAN L. CARLSON
SUPREME COURT CLERK

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Disciplinary Proceeding Against | ) ) ) | No. 201,600-6 |
| DANA KRISTIN FOSSEDAL, | ) ) | En Banc |
| an Attorney at Law. | ) ) ) ) | Filed ____ AUG 1 7 2017 ____ |

OWENS, J. — Dana K. Fossedal misappropriated more than $117,000 in client funds for which she was convicted of first degree theft. The Washington State Bar Association (WSBA) charged her with five violations of the RPCs stemming from this misconduct. After a disciplinary hearing, the hearing officer noted that the presumptive sanction for theft of client funds is disbarment, but nevertheless recommended a three-year suspension. On review, the WSBA Disciplinary Board (Board) modified the hearing officer's decision and unanimously recommended disbarment instead of suspension.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Disciplinary Proceeding Against Fossedal*
No. 201,600-6

Fossedal asks us to reject the Board's unanimous recommendation of disbarment. However, she is unable to identify any clear reason to depart from the Board's recommendation. Accordingly, we disbar Fossedal from the practice of law.

## FACTS

Fossedal has been a licensed attorney in Washington since 1998. In 2005, she opened her own law office, focusing on family law. As of 2009, she employed an associate and a paralegal. Fossedal personally maintained the firm's finances, and was the only person in the office who handled financial matters and signed checks.

By the end of 2009, Fossedal was almost never in the office. By 2011, Fossedal spent "essentially no time" there. Findings of Fact & Conclusions of Law (FF/CL) at 4.

### i. Theft of Brian Schoof's Funds

Around this time, Brian Schoof, a part-time King County Metro bus driver, hired Fossedal to represent him in the dissolution of his marriage. He and Fossedal entered into a fee agreement for an hourly fee of $250 and an advance fee deposit of $5,000. Fossedal assigned the matter to her associate, Misty Hayes, a recent law school graduate. Hayes managed the client file, including attending a mediation. In December 2009, the court entered a "Decree of Dissolution" in the Schoof matter. It awarded $117,225.17 to Schoof as an equalization payment for his interest in the family residence.

2

*In re Disciplinary Proceeding Against Fossedal*
No. 201,600-6

On January 20, 2010, Fossedal received a check for $117,225.17 on behalf of Schoof. Fossedal personally endorsed the check and deposited it into her KeyBank trust account. She did not tell Schoof that she had received his funds and did not disburse any of the money to him.

Fossedal moved all her business and personal accounts, including her trust account, from KeyBank to Chase Bank later that year. On September 3, 2010, she issued a check for $122,434.96 from her KeyBank trust account and deposited it into her new Chase Bank trust account. That check included the $117,225.17 of Schoof's funds.

Over the next year, Fossedal made many withdrawals from the Chase Bank trust account. Most of her withdrawals from trust were wire transfers to her general account or personal account. She testified that she made these transfers based on estimates rather than by keeping track of hours worked. By September 16, 2011, the trust account balance had dropped to a mere $24.74.

Fossedal never disbursed any of Schoof's funds to him. Instead, she used Schoof's funds "for her own benefit, directly or indirectly, without authorization to do so." *Id.* She used his funds for daily business and personal expenses such as payroll, office supplies, rent, symphony and Mariners tickets, groceries, pet food, restaurants, and manicures. Fossedal never sent Schoof any billing statements or accountings before removing his funds from trust.

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

ii.     *Letter from Misty Hayes*

In March 2011, Fossedal's firm was fifteen months delinquent on billing. Hayes, her associate, sent Fossedal a letter expressing her concerns about the firm's financial management and her ethical obligations to its clients, writing:

> I am more than a little concerned about the status of my clients' funds in trust since we have not billed in such a long time. Logic suggests if we are not billing, we cannot be transferring monies out of trust. If we are working on cases, we are earning our fees and that money cannot stay in trust. This creates quite an ethical conundrum. Further, if we are not billing then we are not receiving any payments from our clients. With such high overhead and no incoming funds, I am unclear how you can sustain this firm.

Ex. 9; FF/CL at 6; 1 Verbatim Report of Proceedings (VRP) (Mar. 7, 2016) at 74. Hayes then requested the most recent trust account statements and reconciliations for the client accounts on which she had been working.

Fossedal responded by e-mail the following week, informing Hayes that "you have absolutely no access nor any responsibility as pertains to any of the office financial accounts," and that failure to turn over documents relating to the firm's financial accounts within 24 hours "shall be considered insubordination and cause for possible termination." Ex. 10. In closing, she added that "[t]his letter is intended to relieve you of any ethical obligations regarding the firm's financial business, including the trust accounts." *Id.*; FF/CL at 6; 1 VRP (Mar. 7, 2016) at 86. Hayes left the firm soon thereafter.

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

> iii.     *Schoof's Efforts To Recover His Funds: WSBA Grievance and Civil Suit*

In April 2010, Schoof learned from Hayes that his settlement proceeds had been transferred to Fossedal. He made several attempts to contact Fossedal and recover the funds.

Schoof called Fossedal's office on a monthly basis, seeking disbursement. He was never able to speak with Fossedal, and she never returned his calls. Fossedal either failed to respond to his e-mails or, when she did, failed to provide substantive information or stated that she was sick and "needed time to get back to him with regard to the funds." FF/CL at 7; Ex. 28 (Certification for Determination of Probable Cause at 3).

Schoof filed a grievance with WSBA in May 2012. Fossedal never filed a response.

In July 2012, Schoof hired a lawyer, Hans Juhl, to collect his funds from Fossedal. Juhl unsuccessfully tried to contact Fossedal about the money. However, after getting in touch with Hayes, he obtained a copy of the disbursement check from the title company.

Schoof, through Juhl, sued Fossedal and obtained a default judgment for $161,186.75, which included the amount that Fossedal stole from Schoof, the advance fees Schoof paid, attorney fees, and interest. Juhl tried to get in touch with Fossedal to set up a plan for repayment, to no avail. Ultimately, Schoof was able to collect less

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

than $4,000 by garnishing Fossedal's husband's wages. That money went toward attorney fees to Juhl.

Fossedal filed for bankruptcy in 2014. She listed the default judgment she owed Schoof as an unsecured debt on her bankruptcy schedules. Schoof hired another lawyer to bring an adversary proceeding to contest the dischargeability of the debt based on fraud and defalcation. After Fossedal's husband got a job that paid enough to avoid bankruptcy, Fossedal later abandoned the bankruptcy without obtaining a discharge. Schoof's adversary proceeding was dismissed without prejudice.

In August 2015, the WSBA's Lawyers' Fund for Client Protection (LFCP) made a $117,225.17 gift to Schoof.[1] FF/CL at 9.

### iv. *Fossedal's First Degree Theft Conviction*

On March 5, 2014, the King County Prosecuting Attorney's Office charged Fossedal with first degree theft, with an aggravating factor of abuse of trust.

Fossedal pleaded guilty as charged on July 16, 2014. She filed a "Statement of Defendant on Plea of Guilty" that read, "[W]ith intent to deprive another of property . . . , I executed unauthorized control over money belonging to Brian Schoof. . . . I used my position of trust, confidence, and fiduciary duty as his attorney to facilitate the commission of the theft." *Id.* at 8.

---

[1] This is nearly $44,000 less than the default judgment: the LFCP reimburses claimants for only the actual loss caused by a lawyer's dishonest conduct, not consequential damages. APR 15 Procedural Rules 5(A), (D)(8).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

At sentencing, the prosecutor argued for an exceptional sentence of 12 months. She noted that during the time frame that Fossedal was spending Schoof's money, Schoof was financially destitute, sleeping on a friend's couch, and waiting for his divorce settlement funds to help get him back on his feet. The court sentenced Fossedal to a six-month jail term, later amended to nine months of electronic home monitoring.

The court also ordered Fossedal to pay restitution of $131,065.07, to be applied against Schoof's default judgment. In March 2015, Fossedal began working part time caregiving for a friend's mother, earning $20 per hour. As of March 8, 2016 (the time of the disciplinary hearing), she had still not made any restitution payments to Schoof.

PROCEDURAL HISTORY

Based on the above conduct, the WSBA Office of Disciplinary Counsel (ODC) charged Fossedal with five violations of the RPCs by formal complaint. In her answer, Fossedal admitted the factual allegations in the complaint but contended that "extreme mitigating circumstances" compromised her judgment. Clerk's Papers at 50.

i.     *Fossedal's Disciplinary Hearing*

During a three-day disciplinary hearing, Fossedal, her doctors, her family, and her friends described Fossedal's personal and health problems during the time period when she stole Schoof's funds.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Fossedal explained that she was in car accidents in 2003, 2004, and 2006. She suffered neck injuries and experienced chronic pain from 2006 onward. She tried a variety of pain management techniques including massage, ablation, physical therapy, and medications.

In 2006, under the care of her primary care physician, Dr. Dane Travis, Fossedal was prescribed a variety of opioid pain medications, including Opana, Fentanyl, Vicodin, Gabapentin, and benzodiazepine. She started taking these medications in increased amounts. While Dr. Travis was not concerned that Fossedal was abusing drugs, he did testify that "[t]here's, you know, clearly an inappropriate lack of control and misuse potential, but I didn't see it as drug-seeking behavior as in I'd like to get --enjoy this more, ever, with Dana." 3 VRP (Mar. 9, 2016) at 467.

Fossedal's family and friends recounted that by 2009, Fossedal's personality changed significantly. She was lethargic, slept a lot, and was inactive even when awake. She would pass out midsentence and was unable to complete simple tasks. On the few occasions when Fossedal would leave home for a court appearance, she would need to start sleeping a couple days in advance in order to complete the hearing.

Fossedal was also experiencing other personal and health problems from 2009 to 2011. Her grandparents passed away, she was experiencing marital issues, and she

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

also suffered from sleep apnea, type 2 diabetes, fungal infections, broken bones, and mononucleosis.

Sometime in 2010 or early 2011, Fossedal told Dr. Travis that she was worried about her finances. At this point, Fossedal had not yet removed all of Schoof's funds from trust. Sometime in 2012, Fossedal told Dr. Travis more about her financial problems. According to Dr. Travis, Fossedal told him that she had misused $80,000 to $100,000 of client funds and that she intended to "use it briefly and pay it back." *Id.* at 493.

In 2009 and 2010, Dr. Travis repeatedly implored Fossedal to enter a detoxification program for increasing opioid use. She did not do so at that time. She finally did enter detox in 2012 under the care of a new physician, Dr. Gregory Rudolf, a specialist in pain management and addiction medicine. Dr. Rudolf started her on a different drug, Suboxone, which controls pain but does not have as many side effects as other opioids. Dr. Rudolf testified that as of the time of the disciplinary hearing, "[Fossedal] ha[d] presented me with no evidence or reason to be concerned about altered mental status." *Id.* at 447. He also noted, however, that relapse rates for people who have weaned off opioids are typically high.

When asked about particular events, Fossedal often explained that she did not clearly remember what had happened. She also stated that she did not realize Schoof's money was gone until after she got an e-mail from him in approximately

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

May 2012. She stated, "[T]hat's what prompted me to actually start digging and looking into this and realized he hadn't gotten paid, and the money was gone." 1 VRP (Mar. 7, 2016) at 99. She added that she "felt horrible." 2 VRP (Mar. 8, 2016) at 394.

ii.    *Hearing Officer Decision*

Following the disciplinary hearing, the hearing officer issued his findings of fact and conclusions of law. He concluded that ODC had proved all of the charged violations. Applying the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991 ed. & Feb. 1992 Supp.), he noted that the presumptive sanction for each of the five counts is disbarment. FF/CL at 10-11. He found that Fossedal "acted knowingly and intentionally in committing theft and conversion of client funds and, at least, knowingly in committing other trust account violations." *Id.* at 10. He also found that the "injury to Schoof was serious because he was denied funds he was entitled to receive." *Id.*

The hearing officer found three aggravating factors: multiple offenses, substantial experience in the practice of law, and indifference to making restitution. However, he declined to find the aggravating factors of "dishonest or selfish" motive or "[r]efusal to acknowledge wrongful nature of conduct." *Id.* at 12 (underline omitted). In his oral and written findings, he distinguished "motive" from "intent"

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Disciplinary Proceeding Against Fossedal*
No. 201,600-6

and stated that instead of trying to get rich, Fossedal willfully failed to maintain proper control over her accounts.[2] 3 VRP (Mar. 9, 2016) at 586-87; FF/CL at 11.

He also found eight mitigating[3] factors: absence of a prior disciplinary record, absence of dishonest or selfish motive, personal or emotional problems, full and free disclosure to the disciplinary board or cooperative attitude towards proceedings, character and reputation, physical disability, mental disability or chemical dependency, and remorse. FF/CL at 12-13. Particularly, he concluded that the mitigating factors of physical disability and mental disability/chemical dependency sufficed to mitigate the sanction from disbarment to suspension. However, he found that the six other factors standing alone were not sufficient to mitigate the presumptive sanction of disbarment. *Id.*

The hearing officer recommended that Fossedal be suspended from the practice of law for three years followed by two years of probation. He also recommended that she reimburse $117,225.17 to the LFCP and set out a schedule for such repayments. *Id.* at 13-14.

_____

[2] On appeal to the Board, ODC argued that these and other similar findings were inconsistent with Fossedal's plea of guilty to first degree theft, in which she admitted that she "exerted unauthorized control over Schoof's money with the intent to deprive him of his property." Answering Br. of ODC at 47; Ex. 29.

[3] A typographical error in the FF/CL labeled these as "aggravating" rather than "mitigating" factors. FF/CL at 12.

*In re Disciplinary Proceeding Against Fossedal*
No. 201,600-6

### iii.   Appeal to Disciplinary Board

ODC appealed the hearing officer's decision to the Board. It argued that (1) no extraordinary mitigating factors existed to justify reducing the presumptive sanction from disbarment and (2) under ELC 10.14(c),[4] any findings inconsistent with the mental state of intent, which ODC argues was conclusively proved by the theft conviction, were unsupported.

By a unanimous vote (11-0), the Board modified the hearing officer's decision and recommended that Fossedal be disbarred. Disciplinary Bd. Order Modifying Hr'g Officer's Decision (Board Order) at 1-3. It determined that (1) the mitigating factor of physical disability, alone or in combination with the mitigating factor of mental disability/chemical dependency, was insufficient to establish extraordinary mitigation and (2) the mitigating factor of mental disability/chemical dependency did not apply because the element of causation had not been established. The Board also recommended that Fossedal be required to pay all court-ordered restitution to Schoof and to fully reimburse the LFCP before reinstatement. It did not address ODC's argument regarding ELC 10.14(c).

---

[4] ELC 10.14(c) states that "[i]f a formal complaint charges a respondent lawyer with an act of misconduct for which the respondent has been convicted in a criminal proceeding, the court record of the conviction is conclusive evidence at the disciplinary hearing of the respondent's guilt of the crime and violation of the statute on which the conviction was based."

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Disciplinary Proceeding Against Fossedal*
No. 201,600-6

ISSUE

Should Fossedal be disbarred from the practice of law?

ANALYSIS

This court has the ultimate responsibility for disciplining lawyers. *In re Disciplinary Proceeding Against Van Camp*, 171 Wn.2d 781, 797, 257 P.3d 599 (2011). We give considerable weight to the hearing officer's findings of fact and treat unchallenged factual findings as verities on appeal. *In re Disciplinary Proceeding Against Marshall*, 160 Wn.2d 317, 329-30, 157 P.3d 859 (2007).

The Board is "'the only body to hear the full range of disciplinary matters'" and has "'unique experience and perspective in the administration of sanctions.'" *In re Disciplinary Proceeding Against Anschell*, 141 Wn.2d 593, 607, 9 P.3d 193 (2000) (internal quotation marks omitted) (quoting *In re Disciplinary Proceeding Against Dann*, 136 Wn.2d 67, 84, 960 P.2d 416 (1998)). Accordingly, while we review conclusions of law de novo, we give greater weight to the conclusions of the Board with regard to the recommended sanction than we give to the conclusions of the hearing officer. *In re Disciplinary Proceeding Against McMullen*, 127 Wn.2d 150, 162, 896 P.2d 1281 (1995). When the Board is unanimous, we uphold its decision absent a "'clear reason'" for departure. *Anschell*, 141 Wn.2d at 607 (quoting *In re Disciplinary Proceeding Against Haskell*, 136 Wn.2d 300, 318, 962 P.2d 813 (1998)).

Relying on the ABA *Standards,* we use a well-established, three-step analysis

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

to review the Board's recommended sanction. *In re Disciplinary Proceeding Against Preszler,* 169 Wn.2d 1, 18, 232 P.3d 1118 (2010); *Marshall,* 160 Wn.2d at 342. First, we evaluate whether the Board properly determined the presumptive sanction. Second, we evaluate whether aggravating or mitigating circumstances call for a departure from the presumptive sanction. *Preszler,* 169 Wn.2d at 18. Third, we examine (1) the proportionality of the sanction to the misconduct and (2) the extent of agreement among the members of the Board. *Id.* (quoting *In re Disciplinary Proceeding Against Schwimmer,* 153 Wn.2d 752, 764, 108 P.3d 761 (2005)).

Fossedal does not dispute the hearing officer's factual findings, nor does she dispute that disbarment is the presumptive sanction in her case. Instead, she argues that due to "extraordinary" mitigating factors, we should reject the Board's unanimous disbarment recommendation and reinstate the hearing officer's recommendation of a three-year suspension. We disagree and uphold the Board's unanimous recommendation to disbar Fossedal.

i.  *There Is No Extraordinary Mitigation That Warrants Deviation from the Presumptive Sanction*

Disbarment is the presumptive sanction when a lawyer steals client funds. *See* STANDARDS std. 4.11; *see also In re Disciplinary Proceeding Against Rentel,* 107 Wn.2d 276, 286, 729 P.2d 615 (1986). In such a circumstance, only "'extraordinary'" mitigation will suffice to reduce the sanction from disbarment. *Schwimmer,* 153 Wn.2d at 760 (quoting *Rentel,* 107 Wn.2d at 286).

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Here, the hearing officer found that two factors, standing either alone or in combination with one another, constituted extraordinary mitigation: (1) physical disability due to Fossedal's "significant pain" and (2) Fossedal's opioid dependence. FF/CL at 12-13. As we explain below, the Board properly rejected both of these conclusions. Neither of these factors—either standing alone or in combination— justifies a departure from the presumptive sanction of disbarment.

### a. Significant Pain Is Not an Extraordinary Mitigating Factor

ABA *Standards* std. 9.32(h) states that "physical disability" may be considered a mitigating factor. The hearing officer found that "[t]his factor applies because of Fossedal's significant pain." *Id.* at 12. He also found that this factor, either standing alone or combined with Fossedal's chemical dependency, sufficed to warrant a departure from the presumptive sanction of disbarment. The Board disagreed. It accepted that this factor applied but found that it was "insufficient to establish an extraordinary mitigator as required to depart from the presumptive sanction of disbarment." Board Order at 2. We agree with the Board.

Fossedal merely argues that "[e]xtreme pain is a sufficient symptom to support the conclusion that an attorney's judgment and decision making ability have been impaired to the point that an ethical violation has occurred." Appeal by Dana Kristin Fossedal of Disciplinary Bd. Order Modifying Hr'g Officer's Decision (Appeal) at 21. However, she cites no precedent to support the argument that pain, however severe,

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

constitutes an extraordinary mitigating factor that could serve to reduce the presumptive sanction for theft of client funds.

We do not wish to minimize the debilitating and disabling impact that chronic pain has on many individuals' lives. Nevertheless, such pain does not excuse extreme lapses of an attorney's moral judgment. We agree with the Board's decision that here, significant pain is insufficient to serve as an "extraordinary" mitigator—even when combined with other mitigating factors.

  b. *Fossedal's Opioid Dependence Is Not an Extraordinary Mitigating Factor*

Next, the hearing officer found that under ABA *Standards* std. 9.32(i), the mitigating factor of chemical dependency, either standing alone or in combination with Fossedal's chronic pain, sufficed to justify a departure from the presumptive sanction of disbarment. The Board disagreed, stating that the element of causation had not been met. We affirm the Board. Even if Fossedal did show that her opioid dependence caused her to steal client funds, it would not constitute extraordinary mitigation here.

Under ABA *Standards* std. 9.32(i), mental disability or chemical dependency including alcoholism or drug abuse can serve as a mitigating factor when:

> (1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;
> (2) the chemical dependency or mental disability caused the misconduct;
> (3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

(4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

Fossedal argues that she was in an "opioid haze" and that her chemical dependency caused her to "overlook the proper disbursal of the trust funds owed to Mr. School [sic]." Appeal at 25, 19.[5] She asserts that the testimony by friends and family contains examples of Fossedal's inability to function during the time the Schoof incident occurred, and that we should defer to the hearing officer's evaluation here. *Id.* at 19.

Neither party disputes that Fossedal was affected by a chemical dependency. Indeed, Dr. Travis testified that in November 2009, Fossedal was dysfunctional and that someone on the medications prescribed to her "might not think clearly, rationally, or be able to function very well." 3 VRP (Mar. 9, 2016) at 466. However, as ODC notes, the record does not contain evidence supporting Fossedal's contention that her opioid dependency affected her moral judgment and *caused* her to steal client funds. In fact, Dr. Travis indicated that Fossedal at times emerged from her sedation and dysfunction. In particular, he testified that in 2010 Fossedal's cognitive ability

---

[5] She also argues that the ABA *Standards* do not explicitly require medical evidence to support the notion that Fossedal's opioid dependency caused her to steal client funds. Fossedal is correct that the ABA *Standards* do not *explicitly* require medical evidence to demonstrate the causation element. However, we have held that expert testimony is required to prove medical facts in attorney discipline cases. *See In re Disciplinary Proceeding Against Petersen*, 120 Wn.2d 833, 846 P.2d 1330 (1993) (expert testimony required to establish mitigating factor of depression). Therefore, medical evidence is indeed required here to show that Fossedal's opioid dependence caused her to steal client funds.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

"improved some" and that she had "stabilized," and that through 2010 things "looked a little better." *Id.* at 471, 470.

But even if Fossedal did prove that her drug dependence caused her to steal client funds, it would not be enough to justify a departure from the presumptive sanction of disbarment. We have repeatedly declined to find that drug or alcohol dependence is an extraordinary mitigating factor in cases involving theft of client funds, even if an attorney did not clearly recall actually taking the funds. *See Schwimmer*, 153 Wn.2d at 762 (drug and alcohol addiction did not mitigate attorney's misconduct even when the attorney had "little recollection" of actually taking client funds); *In re Disciplinary Proceeding Against Johnson*, 114 Wn.2d 737, 753, 790 P.2d 1227 (1990) (chronic alcoholism, which attorney claimed affected his "'moral judgment,'" was not an "'extraordinary mitigating circumstance'"); *Rentel*, 107 Wn.2d at 287-88 (drug and alcohol addictions are not extraordinary mitigating factors).

Fossedal cites one situation in which we *did* find extraordinary mitigation in a theft case: *In re Disciplinary Proceeding Against McLendon*, 120 Wn.2d 761, 845 P.2d 1006 (1993). In *McLendon*, an attorney suffering from bipolar disorder misappropriated over $90,000 of client funds from his trust account and was convicted of theft pursuant to an *Alford* plea. *See North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970). The attorney had sought treatment for his

18

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

mental illness but was misdiagnosed and prescribed the wrong medication. *McLendon*, 120 Wn.2d at 763-64, 766-77. This court reduced the sanction from disbarment to a two-year suspension (the longest suspension authorized by rule at that time). *Id.* But *McLendon* is distinguishable from this case for several reasons.

First, the court in *McLendon* made a point to distinguish between mental illness (an "organic brain disease") and alcohol and drug addiction cases. *Id.* at 771-72. It noted that in McLendon's case, there was "uncontroverted psychiatric testimony" that bipolar disorder "altered his judgment and behavior to the extent that his ability to know he acted was severely impaired." *Id.* at 772. The court stressed that McLendon's actions were involuntary, stating that "there is no time when McLendon chose the path which ultimately led to his misconduct." *Id.*

Fossedal's case is different. Dr. Travis indicated that a person on Fossedal's medications might not be able to think clearly, but nothing in the record indicates that her drug use directly affected her moral judgment. Dr. Travis also indicated that Fossedal was, to some degree, aware of her financial situation: Fossedal told him in January 2011 that she was worried about her finances, and later she told him that she had misused client funds and that "her intent was to use it briefly and pay it back." 3 VRP (Mar. 9, 2016) at 493.

*McLendon* is distinguishable for additional reasons. McLendon took actions to repay his clients, selling his belongings in order to do so. *McLendon*, 120 Wn.2d at

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

767. But here, Fossedal has does done nothing to repay Schoof any of the funds that she stole, even in small amounts. Finally, in *McLendon* the Board's decision recommending disbarment was not unanimous (10-2), *id.* at 769, where here, the Board recommended disbarment by an 11-0 vote.

While at times Fossedal may indeed have been in an "opioid haze," the record indicates that to some degree, she was culpable and responsible for her actions. At some point, she "chose the path" that led to her misconduct. *Id.* at 772. We voiced similar reasoning in *Johnson,* where we disbarred an attorney suffering from alcoholism who stole client funds. 114 Wn.2d at 749; *see also Rentel,* 107 Wn.2d 276. We quoted the following language from the Illinois Supreme Court:

> "Not all alcoholics appropriate the money of their clients; the slide from drink to dishonor may be smooth, but it is neither automatic nor uncontrollable. We can understand it; we cannot excuse it or overlook misconduct as serious as respondent's. Alcoholics need not be treated just like other people; our duty to uphold the standards and reputation of the profession is not incompatible with sympathy and leniency for victims of alcoholism. But their tragedy cannot be used as a license to exploit clients by taking their money."

*Rentel,* 107 Wn.2d at 287 (quoting *In re Driscoll,* 85 Ill. 2d 312, 316, 423 N.E.2d 873, 53 Ill. Dec. 204 (1981)). By the same token, while we sympathize with those suffering from opioid dependence, we cannot regard Fossedal as an "innocent victim of forces beyond [her] control." *Driscoll,* 85 Ill. 2d at 316. We must hold her responsible for the harm she caused to the real victim here, Schoof.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

In sum, we decline to find that Fossedal's chemical dependency—either alone or in combination with her chronic pain—"caused" her to steal client funds, or that it serves as an extraordinary mitigating factor here.

### c. The Remaining Mitigating Factors Do Not Warrant a Lesser Sanction

Hearing Officer Keith Scully also found that eight other mitigating factors apply, but found that standing alone, none of them were sufficient to warrant a departure from the presumptive sanction of disbarment. Fossedal asks us to review each of these mitigating factors and find that they should reduce her sanction. However, she merely lists the factors without explaining why they should have any mitigating effect. Thus, we decline to analyze these factors.

### d. We Decline To Address Whether the Hearing Officer's Findings regarding Fossedal's Motive Are Supported by the Record

Relatedly, ODC takes issue with certain hearing officer findings regarding Fossedal's motive and mental state. Hearing Officer Scully found that Fossedal "acted knowingly and intentionally in committing theft and conversion of client funds." FF/CL at 10. However, he also—perhaps paradoxically—found that "Fossedal's motive was neither selfish nor dishonest" and that she did not clearly remember most of 2009-2011. *Id.* at 9-10. He also found that Fossedal "was not aware, although she should have been aware, that Mr. Schoof's money was used for firm and personal expenses." *Id.* at 9.

21

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

ODC argues that these and other hearing officer findings "inconsistent with the mental state of intent"[6] are unsupported by the record because Fossedal's mental state of intent was conclusively proved by her first degree theft conviction. Answering Br. of ODC at 17, 46. It notes that ELC 10.14(c) states that a "'court record of the conviction is conclusive evidence at the disciplinary hearing of the respondent's guilt of the crime and violation of the statute on which the conviction was based.'" *Id.* at 45 (quoting ELC 10.14(c)).

But the Board did not address this issue, and it is not necessary for us to invalidate the hearing officer's findings in order to disbar Fossedal. *See Schwimmer*, 153 Wn.2d at 760 (distinction between knowingly misusing client funds rather than intentionally misappropriating them immaterial because in either case, a lawyer's failure to preserve the integrity of client funds leads to disbarment absent extraordinary mitigating circumstances). Thus, we decline to address this issue.

### ii. *Disbarment Is a Proportionate Sanction*

Finally, we may depart from a recommendation of the Board if we are persuaded that the sanction is inappropriate in light of two factors: (1) proportionality

---

[6] In particular, these challenged findings are as follows:
- FF/CL ¶ 14 states that Fossedal does not clearly remember most of 2009-2011.
- FF/CL ¶ 41 states Fossedal did not realize that Schoof had not been paid until May 2012, after he filed his grievance.
- FF/CL ¶ 53 states that Fossedal "was not aware, although she should have been aware, that Mr. Schoof's money was used for firm and personal expenses."
- FF/CL ¶ 64(b) and 65(b) state that Fossedal lacked a dishonest or selfish motive.

Answering Br. of ODC at 17.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

of the sanction to the misconduct and (2) the extent of agreement among the members

of the Board. *In re Disciplinary Proceeding Against Kuvara*, 149 Wn.2d 237, 259, 66

P.3d 1057 (2003).

Fossedal has cited five cases[7] in which "this Court has imposed suspension as

the appropriate sanction when disbarment seems automatic." Appeal at 23. However,

all of those cases are different from this one. First, they all involve a nonunanimous

recommendation of the Board. Second, they all involve factual situations that are

distinguishable from this case. *See, e.g., In re Disciplinary Proceeding Against*

*Dynan*, 152 Wn.2d 601, 621, 98 P.3d 444 (2004) (lawyer submitted altered billing

statements to a court, but did not steal client funds); *In re Disciplinary Proceeding*

*Against Christopher*, 153 Wn.2d 669, 684-85, 105 P.3d 976 (2005) (lawyer falsified

court documents and forged secretary's signature but did not steal client funds). The

only case that is factually similar to this one is *McLendon*, which we have already

discussed at length above.

The purpose of attorney discipline is to protect the public and preserve

confidence in the legal system. *Rentel*, 107 Wn.2d at 282. Here, the Board

unanimously voted to recommend disbarment, which is a proportionate sanction that

---

[7] *In re Disciplinary Proceeding Against Christopher*, 153 Wn.2d 669, 105 P.3d 976 (2005); *In re Disciplinary Proceeding Against Dynan*, 152 Wn.2d 601, 619, 98 P.3d 444 (2004); *In re Disciplinary Proceeding Against Tasker*, 141 Wn.2d 557, 9 P.3d 822 (2000); *Haskell*, 136 Wn.2d 300; *McLendon*, 120 Wn.2d 761.

23

*In re Disciplinary Proceeding Against Fossedal*
No. 201,600-6

serves both of these goals. Fossedal took all of Schoof's settlement funds. She possessed these funds only because of the position of trust she occupied as Schoof's lawyer. Meanwhile, Schoof was financially destitute, sleeping on a friend's couch. And although Fossedal has expressed remorse, she has done nothing to repay any of the money she misappropriated. In light of this court's "strong policy against client fund violations," disbarment is the only acceptable sanction here. *Rentel*, 107 Wn.2d at 289. Any other sanction would send an untenable message to the public that opioid use may excuse stealing client funds.

## CONCLUSION

We adopt the Board's recommendation and disbar Fossedal from the practice of law. We also affirm the Board's recommendation that Fossedal be required to pay all court-ordered restitution to Schoof and restitution to the LFCP before reinstatement.

*In re Disciplinary Proceeding Against Fossedal*
No. 201,600-6

_____ Owens, J.

WE CONCUR:

Fairhurst, C.J. _____

_____ Wiggins, J.

_____ (Johnson, J.)

_____ González, J.

Madsen, J. _____

_____ Stephens, J. (Gordon McCloud, J.)

_____ Yu, J.